James JOHNSON, Plaintiff-Respondent,

v.

MISERICORDIA COMMUNITY HOSPITAL and Employers Mutual Liability Insurance Company of Wisconsin, Defendants-Appellants.†

Court of Appeals

*No. 79–696. Submitted on briefs March 5, 1980.— Decided May 12, 1980.*
(Also reported in 294 N.W.2d 501.)

† Petition to review granted.

522

524

For the appellant the cause was submitted on the briefs of *C. Donald Straub* and the *Law Office of C. Donald Straub* of Milwaukee.

For the respondent the cause was submitted on the brief of *Gerald J. Bloch* and *Phillips & Block, S.C.,* of Milwaukee.

Before Decker, C.J., Moser, P.J., and Cannon, J.

CANNON, J. On July 11, 1975, plaintiff-respondent Johnson underwent surgery at Misericordia Hospital in Milwaukee for removal of a pin fragment from his right hip. The surgery was performed by Dr. Lester V. Salinsky. During the course of the operative procedure, plaintiff's right femoral artery and nerve were severed. The damage led to permanent paralysis of plaintiff's right thigh muscles, with resultant atrophy, weakness and loss of function.

Prior to trial, the plaintiff entered into a settlement agreement with Dr. Salinsky whereby Dr. Salinsky

agreed to pay plaintiff $140,000. Plaintiff in turn executed a Pierringer-type release absolving Dr. Salinsky from any further liability in this case. Upon conclusion of the trial, the jury found that Dr. Salinsky was negligent in the manner in which he performed the surgery, and attributed twenty percent of the causal negligence to him. The jury also found Misericordia Community Hospital (Misericordia) negligent with respect to its granting of orthopedic privileges to Dr. Salinsky, and apportioned eighty percent of the causal negligence to the hospital. Damages were awarded in the sum of $315,000 for personal injuries, past and future, and $90,000 for impairment of earning capacity, past and future. Misericordia appeals from the judgment.

A review of the facts with respect to plaintiff's cause of action against Misericordia is necessary before we can undertake a discussion of the issues presented. Misericordia Community Hospital began operation as a state-approved and licensed general hospital[1] in approximately November of 1972. On March 5, 1973, Dr. Lester Salinsky applied for appointment to the medical staff of Misericordia, requesting full surgical and orthopedic privileges. In his application, Dr. Salinsky indicated that he was on the active medical staff of Doctors Hospital in Milwaukee with full orthopedic privileges, and held consultant privileges at New Berlin Community Hospital and Northwest General Hospital. Dr. Salinsky further stated that his privileges had never been suspended, diminished, revoked or not renewed at any hospital. Finally, he failed to answer any questions regarding malpractice liability insurance, nor did he identify any of his carriers. This information was omitted despite the fact that the application contained a consent permitting

[1] Wis. Adm. Code 24.01(4)(b)1. General hospital. A "general hospital" is a hospital providing community service for inpatient medical and surgical care of acute illness or injury and/or for obstetrics.

the hospital staff to consult with past and present malpractice carriers "who may have information bearing upon [his] professional competence, character, and ethical qualifications."

Contrary to the above, Dr. Salinsky had experienced curtailment, investigation and denial of his hospital staff privileges at other Milwaukee hospitals. On January 10, 1973, Dr. Salinsky had been notified that his surgical privileges at Doctors Hospital in Milwaukee were severely restricted, *i.e.*, all privileges for procedures involving the hip were withdrawn, and a qualified preoperative consultation by another physician was required prior to any open surgical procedure being attempted. In 1971, St. Anthony Hospital had denied Dr. Salinsky any privileges. In December, 1963, Mount Sinai Hospital had restricted Dr. Salinsky's privileges to perform complex orthopedic surgery, limiting his practice to that of a courtesy physician in the Department of General Practice. Finally, the administrators of both Northwest General Hospital and New Berlin Memorial Hospital testified that they had no records of Dr. Salinsky's having been associated with their hospitals.

Notwithstanding the above, Dr. Salinsky's appointment to the medical staff at Misericordia was approved on June 22, 1973 by David A. Scott, administrator of the hospital. Shortly after his admission, Dr. Salinsky was elected chief of the medical staff at Misericordia. The record is devoid of any provision as to how he was elected chief of staff. On August 8, 1973, Dr. Salinsky's staff privileges and requested orthopedic privileges were marked approved, and the approval endorsed by Dr. Salinsky himself.

Counsel for Misericordia has raised thirty issues for our consideration on appeal. In the interest of conciseness, we have organized these issues under the four ele-

ments of a cause of action in negligence.[2] Evidentiary questions and related matters will be discussed thereunder. Succinctly stated, the basic issues are:

1. Does a hospital have a duty to exercise reasonable care in the selection of its medical staff and in the granting of specialized surgical privileges?

2. Did Misericordia exercise ordinary care in failing to scrutinize Dr. Salinsky's credentials before his application for permission to use hospital facilities was approved?

3. Was there a causal relationship between Misericordia's conduct in failing to check Dr. Salinsky's references prior to allowing him to use its facilities, and the resulting injury to the plaintiff?

4. Was there sufficient credible evidence to sustain the jury's determination of damages for personal injuries and impairment of future earning capacity?

## I. DUTY

The classic statement in Wisconsin regarding the requirements for establishing duty in a claim of negligence is found in *A. E. Investment Corporation v. Link Builders, Inc.*, 62 Wis.2d 479, 483, 214 N.W.2d 764, 766 (1974) : "The duty of any person is the obligation of due care to refrain from any act which will cause foreseeable harm to others even though the nature of that harm and the identity of the harmed person or harmed interest is unknown at the time of the act." The court further noted:

A defendant's duty is established when it can be said that it was foreseeable that his act or omission to act

[2] *Keller v. Welles Department Store of Racine, et al.: Sperry*, 88 Wis.2d 24, 34, 276 N.W.2d 319, 323 (Ct. App. 1979); *Coffey v. City of Milwaukee, et al.: One Fifty Two, Inc., et al.*, 74 Wis.2d 526, 531, 247 N.W.2d 132, 135 (1976).

may cause harm to someone. A party is negligent when he commits an act when some harm to someone is foreseeable. Once negligence is established, the defendant is liable for unforeseeable consequences as well as foreseeable ones. In addition, he is liable to unforeseeable plaintiffs. *Id.* at 484, 214 N.W.2d at 766.[3]

Inexorably interwoven with the concept of duty then is that of foreseeability. *Coffey, supra* at 537, 247 N.W.2d at 138. The harm foreseen must also present an unreasonable risk of danger. *Wilson, supra* at 318, 274 N.W. 2d at 683; Restatement (Second) of Torts §291 at 54; Prosser, *Torts* §31 at 145 (4th ed. 1971). Whether Misericordia owed a duty to this plaintiff depends on whether it was foreseeable that failure to scrutinize Dr. Salinsky's credentials in accordance with established standards would cause harm to someone. This involves a question of law for the court. *Olson v. Ratzel,* 89 Wis.2d 227, 250, 278 N.W.2d 238, 249 (Ct. App. 1979) ; *Schicker v. Leick,* 40 Wis.2d 295, 299, 162 N.W.2d 66, 69 (1968).

The liability which is sought to be imposed here is not a vicarious one. Misericordia is charged with wrongdoing separate and distinct from that of Dr. Salinsky. Dr. Salinsky was not an employee of the hospital, but an independent contractor. This plaintiff was a private patient who had consulted Dr. Salinsky for treatment outside of the hospital environment. In most instances, a hospital will not be liable for the negligent acts of those over whom it has no control. The theory of the case before us, however, is that Misericordia, by its tortious actions (or inactions) created a situation in which the natural, probable and foreseeable consequences were

[3] *Accord, Wilson, et ux. v. Continental Insurance Companies, et al.,* 87 Wis.2d 310, 318, 274 N.W.2d 679, 683 (1979); *Keller, supra* n. 2 at 35, 276 N.W.2d at 324; *Hartridge v. State Farm Mutual Automobile Insurance Company, et al.,* 86 Wis.2d 1, 10, 271 N.W.2d 598, 602 (1978).

harm of the type which resulted. This concept of holding a hospital liable for its own negligence has been termed "corporate negligence." In this context, it has been defined as the failure of a hospital, entrusted with the task of providing the accommodations necessary to carry out its purpose, to follow the established standard of conduct to which it should conform. *Bader v. United Orthodox Synagogue*, 148 Conn. 449, 453, 172 A.2d 192, 194 (1961). Corporate negligence differs from the doctrine of *respondeat superior* because it imposes on the hospital a non-delegable duty owed directly to the patient, disregarding the details of the doctor-hospital relationship. Southwich, *The Hospital's New Responsibility*, 17 Clev.-Mar. L. Rev. 146, 151-2 (1968). We are of the opinion that Misericordia's failure to adhere to established procedures with regard to the "credentials process" involved a breach of the separate and distinct duty owed to potential patients and, therefore, created a foreseeable and unreasonable risk of harm to such patients.

Misericordia relies on sec. H24.04 (1) (d) 1 of the Wis. Adm. Code for its claim that there is no legal duty to exercise care in scrutinizing the credentials of a physician who requests admission to the staff:

(d) Staff appointments shall be made by the governing body, taking into account recommendations made by the active staff.
1. The governing body shall have the legal right to appoint the medical staff and the moral obligation to appoint only those physicians who are judged by their fellows to be of good character and qualified and competent in their respective fields. [Footnotes omitted.]

Thus, Misericordia claims that even if this court finds a duty, such duty can be only moral in nature, and not of sufficient substance upon which to base legal liability for plaintiff's injuries. The Wis. Adm. Code, however,

also makes it clear that the medical staff is "responsible to the governing body of the hospital for the quality of all medical care provided patients in the hospital, and for the ethical and professional practices of its members." Wis. Adm. Code, sec. H24.04(1). The measure of quality and the degree of quality control exercised in a hospital, then, is the direct responsibility of the medical staff.

Today, in response to demands of the public, the hospital is becoming a community health center. The purpose of the community hospital is to provide patient care of the highest possible quality. . . . The staff must be organized with a proper structure to carry out the role delgated [sic] to it by the governing body. All powers of the medical staff flow from the board of trustees, and the staff must be held accountable for its control of quality. . . . The role of the hospital vis-a-vis the community is changing rapidly. The hospital's role is no longer limited to the furnishing of physical facilities and equipment where a physician treats his private patients and practices his profession in his own individualized manner. The right to enjoy medical staff privileges in a community hospital is not an absolute right, but rather is subject to the reasonable rules and regulations of the hospital. Licensing, *per se,* furnishes no continuing control with respect to a physician's professional competence and therefore does not assure the public of quality patient care. The protection of the public must come from some other authority, and that in this case is the Hospital Board of Trustees. The Board, of course, may not act arbitrarily or unreasonably in such cases. The Board's actions must also be predicated upon a reasonable standard. *Moore v. Board of Trustees of Carson-Tahoe Hospital,* 495 P.2d 605, 608 (Nev. 1972).

Thus the medical staff emerges not as a separate entity but as part of the legally constituted hospital corporation, having been created by the governing board. The medical staff becomes an organizational extension of the board, carrying out necessary quality control func-

tions.[4] The board in turn must inevitably render public accountability for the effective discharge of those functions. Achievement of the goal of good patient care is a direct result of an organization's effectiveness in identifying less-than-ideal patterns of practice in its potential staff. Without diligence in the areas of preventive and corrective measures by its governing members, a hospital could easily develop into an enclave of professional obsolescence and gross incompetence.

The members of the medical staff of a hospital are obviously the key to the quality of the hospital's performance. They are engaged in a joint enterprise. While the degree of their interdependence varies with the nature of their respective specialties and skills, there is a mea-

---

[4] In an unprecedented case which incorporated the medical staff into the hospital corporate body, *Corleto v. Shore Memorial Hospital*, 138 N.J. Super. 302, 350 A.2d 534 (1975), the plaintiff named as defendant the hospital, its administrator and the entire medical staff, (all 141 physicians). The suit contended that the doctors on the medical staff could be sued because they constituted an unincorporated association and, therefore, each member was responsible for the acts of the others. The trial court refused to grant the defendants' motion to dismiss and held the medical staff amenable to suit as an unincorporated defendant. The case was ultimately settled before going to trial.

For a discussion of the growth of the concept that the medical and non-medical parts of a hospital organization are part of one functional unit *see:*

Horty and Mulholland, *The Legal Status of the Hospital Medical Staff*, 22 St. Louis Univ. Law Journal 485 (1978); Williams, *The Quandary of the Hospital Administrator in Dealing with the Medical Malpractice Problem*, 55 Neb. L. Rev. 401 (1976); Fabro, *Legal Relationship of Physician to Hospital*, 43 Conn. B.J. 418 (1969); Southwich, *Hospital Medical Staff Privileges*, 18 De Paul L. Rev. 566 (1969).

For a discussion of the role of the hospital and medical staff in monitoring medical staff applications for privileges and subsequent performance, *see:*

Note, *Independent Duty of a Hospital to Prevent Physician's Malpractice*, 15 Ariz. L. Rev. 953 (1953); Note, *Hospital Liability for the Negligence of Physicians; Some Needed Legal Sutures*, 26 Fla. L. Rev. 844 (1974).

sure of interdependence which underlies their total relationship. Each has a stake in the level of performance of the others. *Suckle, M.D. v. Madison General Hospital,* 362 F. Supp. 1196, 1209 (W.D. Wis. 1973).

At the risk of belabored definition, the integration of a modern hospital becomes readily apparent as the various boards, reviewing committees, and designation of privileges are found to rest on a structure designed to control, supervise, and review the work within the hospital. The standards of hospital accreditation, the state licensing regulations, and the respondent's bylaws demonstrate that the medical profession and other responsible authorities regard it as both desirable and feasible that a hospital assume certain responsibilities for the care of the patient. *Darling, II v. Charleston Community Memorial Hospital,* 33 Ill.2d 326, 211 N.E.2d 253, 257 (1965) ; *Hull v. North Valley Hospital,* 498 P.2d 136, 143 (Mont. 1972).

The Wis. Adm. Code regulations reflect the supervisory action required of a hospital regarding the appointment of physicians to its staff:

(e) Members of the staff shall be qualified legally, professionally, and ethically for the positions to which they are appointed.

1. To select its members and delineate privileges, the hospital medical staff shall have a system, based on definite workable standards, to evaluate each applicant by its credentials committee (or in small hospitals, committee-of-the-whole) which makes recommendations to the medical staff and to the governing body.

. . . .

3. Criteria for selection shall be individual character, competence, training, experience, and judgment.

. . . .

5. The scope of privileges to be accorded the physician shall be indicated. The privileges of each staff member shall be specifically stated or the medical staff shall define a classification system. If a system involving classification is used, the scope of the divisions shall be well defined, and the standards which must be met by the applicant shall be clearly stated for each category. Wis. Adm. Code, sec. H24.04(1) (e).

(j) The executive committee (or its equivalent) shall coordinate the activities and general policies of the various departments, act for the staff as a whole under such limitations as may be imposed by the staff, and receive and act upon the reports of the medical records, tissue, and such other committees as the medical staff may designate.

. . . .

3. Its functions and responsibilities include:

. . . .

b. Investigating any reports of breach of ethics by members of the medical staff, as referred to this committee by the credentials committee. Wis. Adm. Code, sec. H24.04(j)3b.

(k) The credentials committee (or its equivalent) shall review applications for appointment and reappointment to all categories of the staff. They shall delineate the privileges to be extended to the applicant and make appropriate recommendations to the governing body according to the procedure outlined in the hospital's medical staff bylaws.

1. The committee shall make recommendations for initial appointment, hospital privileges, promotions, and demotions. Wis. Adm. Code, sec. H24.04(k)1.

Hospital supervision of the manner of appointment of physicians to its staff is mandatory, not optional. We view the language of the code as compelling: A hospital *shall* have a system based on standards to evaluate applicants for membership; *shall* evaluate each applicant; *shall* use criteria such as character, competence and training to select staff; standards required for admission to a particular medical classification *shall* be well defined; and the standards *shall* be clearly stated. Sections 140.05(3) and 140.27(1), Stats. (1967)[5] are the en-

---

[5] Section 140.05, Stats. (1967):

Powers and Duties. (1) The state board of health shall have general supervision throughout the state of the health and life of citizens, and shall study especially the vital statistics of the state and endeavor to put the same to profitable use. It shall make sanitary investigations into the causes of disease, especially epidemics, the causes of mortality, and the effect on health

abling statutes by which authority is granted to promulgate the rules in the Wis. Adm. Code. A rule is defined in sec. 227.01(9) as:

of localities, employments, conditions, habits and circumstances, and make sanitary inspections and surveys in all parts of the state. It may, upon due notice, enter upon and inspect private property. It shall have power to execute what is reasonable and necessary for the prevention and suppression of disease. It shall voluntarily or when required, advise public boards or officers in regard to heating and ventilation of any public building or institution. It may send its secretary or a committee to any part of the state to investigate the cause and circumstances of any special or unusual disease or mortality, or to inspect any public building; and such officers shall have full authority to do any act necessary therefor. The board may establish bureaus and shall possess all powers necessary to fulfill the duties prescribed in the statutes and to bring action in the courts for the enforcement of health laws and health rules. It may empower the state health officer to act for the board upon such matters as it may determine in issuing and enforcing orders in compliance with law and rules and regulations adopted by the board. Whenever anyone feels aggrieved by any order of a state health officer, he may appeal to the board.

Section 140.27, Stats. (1967):

Rules and Standards. (1) The board shall promulgate, adopt, amend and enforce such rules and standards for all hospitals as defined herein for the construction, maintenance and operation of the hospitals deemed necessary to provide safe and adequate care and treatment of the patients in the hospitals and to protect the health and safety of the patients and employes; and nothing contained herein shall pertain to a person licensed to practice medicine and surgery or dentistry. The building codes and construction standards of the industrial commission shall apply to all hospitals and the board may adopt additional construction codes and standards for hospitals, provided that they are not lower than the requirements of the industrial commission. Except for the construction codes and standards of the industrial commission and except as provided in s. 140.29(3) the board shall be the sole agency to adopt and enforce rules and standards pertaining to hospitals as defined herein.

The 1967 Wisconsin Statutes are applicable as ch. H24 of the Wis. Adm. Code was created, Register, May, 1968, No. 149, eff. June 1, 1968.

[A] regulation, standard, statement of policy or general order (including the amendment or repeal of any of the foregoing), of general application and *having the effect of law,* issued by an agency to implement, interpret or make specific legislation enforced or administered by such agency or to govern the organization or procedure of such agency. [Emphasis supplied.]

When a municipality or administrative board or commission has the power to create a standard of conduct, the municipal ordinance, rule of such board or commission has the same force and effect of a statute enacted by the legislature. *Verbeten v. Huettl,* 253 Wis. 510, 34 N.W.2d 803 (1948). The general rule is that the word "shall" is presumed mandatory when it appears in a statute. *Karow v. Milwaukee County Civil Service Commission, et al.,* 82 Wis.2d 565, 570, 263 N.W.2d 214, 217 (1978).

Misericordia's bylaws were modeled after the requirements of the Wis. Adm. Code. They list, in pertinent part, these goals:

1. To ensure that all patients admitted to the hospital, in any of its departments, receive the best possible care.
. . . .
3. To initiate and maintain self-government and professional discipline.
4. To provide education and to maintain high educational standards.

The bylaws further established that to achieve these goals:

The Credentials Committee shall examine the application and signed agreement; investigate the character and professional standing of the applicant and in counsel with the department in which the applicant is applying, inquire into the qualifications of the applicant. The committee shall report its findings to the Executive Committee, adding its recommendations that the application be accepted, not approved or deferred. It shall further rec-

ommend the privileges to be assigned to the applicant as provided in Article VI of these by-laws. This report and recommendation shall be submitted promptly and in no event later than three months from the date of filing of the application.

What a defendant must do is a question of the standard of conduct required to satisfy the existing duty. In the case before us, the Wis. Adm. Code and Misericordia's own bylaws established a procedure for screening a physician's credentials upon application to the medical staff. These guidelines established the procedure that Misericordia's medical executive committee[6] should have followed in this case.

Misericordia objects to the introduction of the bylaws into evidence. While not specifying the basis for its objection, it would appear to be based on the rule that regulations adopted by private organizations are irrelevant because the standard of care upon which recovery must be based is set by law. *Marolla v. American Family Mutual Insurance Company,* 38 Wis.2d 539, 157 N.W.2d 674 (1968).[7] However, the bylaws in this case were re-

[6] According to the minutes of the Misericordia medical staff meeting of June 21, 1973, the medical director noted that with regard to "the physician's applications and approval of such, [it] was the responsibility of the executive committee in lieu of a non-functioning credentials committee."

[7] In *Marolla,* the Wisconsin Supreme Court affirmed a trial court's refusal to admit a railroad safety rule in a case involving a collision between a motorized railway track car and an automobile. The action was brought by the operator of the track car against the automobile operator. The trial court refused to admit evidence proffered by the defendant's insurer of a safety rule adopted by the railroad relating to the stopping of track cars at highway crossings. The supreme court held that company rules of safety and operation should not be admitted in litigation against non-company parties because to do so could result in holding an employee of one railroad company to a higher standard of care on the basis of more stringent company rules than an employee of another railroad with less stringent private standards.

quired by the Wis. Adm. Code[8] as part of the licensing procedure. Modeled after the Wis. Adm. Code, they embody much of the code's language. In *Marolla, supra* at 547, 157 N.W.2d at 678, the court noted this exception to the above-mentioned rule: "If it could be shown that an entire industry or substantially an entire industry had essentially the same safety regulations, we would be confronted with a different problem, . . . ." This exception is applicable to this case. The Wis. Adm. Code standards apply uniformly to all licensed hospitals and as incorporated into Misericordia's bylaws did not represent isolated company safety rules for internal use only.

Therefore, the bylaws were properly admitted.[9] They aided the jury in determining whether Misericordia was in compliance with code standards. By holding itself out

[8] H24.02 Governing Body. (1) The hospital shall have an effective governing body legally responsible for the conduct of the hospital as an institution.

(a) The governing body shall have adopted bylaws in accordance with legal requirements.

1. The bylaws shall be in writing and available to all members of the governing body.

2. The bylaws shall:
. . .

e. Provide for the appointment of members of the medical staff.

f. Provide mechanisms for the formal approval of the organization, bylaws, rules and regulations of the medical staff and its departments in the hospital.

[9] In *Darling v. Charleston Community Memorial Hospital*, 33 Ill.2d 326, 211 N.E.2d 253, 257 (1965), *cert. denied*, 383 U.S. 946 (1966) the court held bylaws admissible, although not conclusive, evidence of the applicable community standard in an action by a plaintiff against a hospital:

In the present case the regulations, standards, and bylaws which the plaintiff introduced into evidence, performed much the same function as did evidence of custom. This evidence aided the jury in deciding what was feasible and what the defendant knew or should have known. It did not conclusively determine the standard of care and the jury was not instructed that it did.

as a licensed health care facility, Misericordia assumed certain responsibilities for the care of its patients, and thereafter was required to meet the standards of responsibility commensurate with this trust:

Having undertaken one of mankind's most critically important and delicate fields of endeavor, concomitantly therewith the hospital must assume the grave responsibility of pursuing this calling with appropriate care. The care and service dispensed through this high trust, however technical, complex and esoteric its character may be, must meet standards of responsibility commensurate with the undertaking to preserve and protect the health, and indeed, the very lives of those placed in the hospital's keeping. *Beeck v. Tucson General Hospital,* 18 Ariz. App. 165, 500 P.2d 1153, 1157 (Ct. App. 1972).

Whether Misericordia should have known of Dr. Salinsky's incompetence was a question of fact properly before the jury. The jury had a right to consider the Wis. Adm. Code and Misericordia's own bylaws in determining whether there was a breach of duty.

While the issue now before us has not been previously raised in Wisconsin, other jurisdictions have considered the responsibility of a hospital to properly review a physician's credentials upon application to the medical staff, and have held as we do. In *Mitchell County Hospital Authority, et al. v. Joiner,* 229 Ga. 140, 189 S.E.2d 412 (1972), the Georgia Supreme Court held that a board of directors operating a public hospital had authority to examine the qualifications of physicians seeking staff privileges, and to limit their practice to those areas in which they were deemed qualified to practice or to bar them completely from practicing if incompetent or unqualified. In affirming the court of appeals' denial of summary judgment, the supreme court stated:

As pointed out by the decision of the Court of Appeals, the delegation of the authority to screen applicants for staff membership on the medical staff does not relieve

the Authority of its responsibility, since the members of such staff act as agents for the Authority, and whether it knew or from the information in its possession the incompetency of the physician was known, is a question of fact. If the physician was incompetent and the Authority knew, or from information in its possession such incompetency was apparent, then it cannot be said that the Authority acted in good faith and with reasonable care in permitting the physician to become a member of its staff. *Mitchell County, supra,* 189 S.E.2d at 414.

In *Mitchell,* the plaintiff alleged, as here, that the hospital failed to require the co-defendant doctor to prove his professional competence and failed to exercise care in determining his character. The court's decision not only holds that a hospital may be directly liable for harm resulting from the negligent selection of a staff physician, but that the hospital cannot rely on the fact that an applicant is a licensed physician, and *must* undertake its own investigation of that applicant's competency.

The supreme courts of Arizona, Michigan, Missouri and Montana have also held that hospitals have a right and duty to patients to allow only competent physicians to exercise hospital privileges as members of the hospitals' medical staffs.

In *Gridley v. Johnson, et al.* 476 S.W.2d 475 (Mo. 1972), the Missouri Supreme Court also refused to take the issue of institutional liability from the jury. There the court denied a motion to dismiss plaintiff's complaint against the hospital, and held that if the plaintiff could prove that the hospital had allowed members of its medical staff to violate its standards, then the hospital would be liable for granting staff privileges. The case was remanded to the trial court for determination of that issue.

In *Purcell v. Zimbelman,* 18 Ariz. App. 75, 500 P.2d 335 (1972), the plaintiff obtained a jury verdict against a hospital based on the hospital's failure to restrict Dr. Purcell's staff privileges when it knew or should have

known that he lacked the skill to treat the condition in question. Plaintiff alleged that Dr. Purcell was negligent in performing a "pull through" operation which was not medically indicated. Expert testimony for the plaintiff established that another type of surgery should have been performed. In affirming the trial court, the court of appeals relied on evidence that the hospital had a physician's committee to regulate the granting of staff privileges and reasoned that the hospital had therefore assumed the duty of supervising the competence of the physicians it admitted and maintained on its staff.

In *Ferguson v. Gonyaw*, 64 Mich. App. 685, 236 N.W. 2d 543 (1975), the plaintiff alleged that a hospital was negligent in not verifying the facts on a physician's application for medical staff privileges. Plaintiff claimed that a reasonable and prudent hospital would have verified the information on the application, determined that the physician had inadequate training to practice neurosurgery on its premises, and refused the physician's admission to the staff. The Michigan Court of Appeals upheld the directed verdict for the hospital, noting that while the hospital did not act as a reasonably prudent hospital in checking the physician's qualifications to be a staff member, had the hospital checked, it would have found him to be qualified. In reaching its decision, the court relied on the following rule: "One of the hospital's primary functions is to screen its staff of physicians to 'insure' that only competent physicians are allowed to practice in the hospital." *Ferguson, supra* 236 N.W.2d at 550. *See also* discussion of *Hull v. North Valley Hospital,* 159 Mont. 375, 498 P.2d 136 (1972) *infra.*[10]

_____

[10] Additional cases that have dealt with alleged negligence in granting staff privileges have also discussed hospital responsibility for continued review of the performance of an independent practitioner member of the medical staff. While the question of

## II. BREACH OF DUTY

Where the court determines that the facts alleged give rise to a duty, the defendant's failure to exercise

continued review of a physician's performance is not before this court, we note these cases as they relate to the issue before us in the interest of completeness. Perhaps the most cited and most controversial case dealing with the concept of institutional responsibility for a physician's performance is *Darling v. Charleston Community Memorial Hospital, supra* note 9. Although there is dispute as to the proper interpretation of the case, it is generally accepted that *Darling* suggests that a hospital governing body has a duty to evaluate the quality of patient care and, when necessary, to take action to avoid an unreasonable risk of harm to a patient arising from treatment by an attending physician. *See, e.g.,* Ludlum, *The Impact of the Darling Decision upon the Practice of Medicine and Hospitals,* 11 Forum 756 (1976); Moore, *Medical Staff-Corporate Accountability,* 43 Ins. Counsel J. 110 (1976); *The Hospital and the Staff Physician—An Expanding Duty of Care,* 7 Creighton L. Rev. 249 (1974); *The Hospital-Physician Relationship: Hospital Responsibility for Malpractice of Physicians,* 50 Wash. L. Rev. 385 (1975).

In *Moore v. Board of Trustees of Carson-Tahoe Hospital,* 495 P.2d 605 (Nev. 1972), the Nevada Supreme Court upheld revocation of a physician's staff privileges when the hospital contended that the physician's conduct violated the hospital's own rule against "unprofessional conduct." The majority upheld the hospital's action in withholding the physician's privileges and held the standard of "unprofessional conduct" to be sufficiently objective to guide the medical staff and the hospital board. The court, therefore, affirmed the hospital's responsibility to scrutinize the credentials of a physician given staff privileges and further noted that preciseness in selection standards may be "impossible, perhaps even undesirable in view of rapidly shifting standards of medical excellence and the fact that a human life may be and quite often is involved in the ultimate decision of the board." *Moore, supra* 495 P.2d at 607 [quoting *North Broward Hospital District v. Mizell,* 148 So.2d 1, 5 (Fla. 1962)].

In *Corleto v. Shore Memorial Hospital, supra* note 4, the plaintiff sued not only the defendant doctor but the hospital, the ad-

the proper standard of care in the performance of that duty must be addressed. In a malpractice action, the legal duty of a physician, a hospital's employee or the

ministrator, the board of directors and the medical staff, on the grounds that they should have known the defendant doctor was incompetent to perform the surgical procedure involved. The hospital argued that the physician was an independent contractor and that the hospital should not be liable for public policy reasons, *i.e.*, to impose liability on them would have a detrimental effect on the composition of hospital boards, increase insurance and limit delivery of health care. The court denied the motion to dismiss for public policy reasons and compared the situation to one wherein a person who engages an incompetent independent contractor may be held liable for any harm the contractor causes. Thus the court held that a hospital had a duty not to admit an incompetent to surgical procedures and to subsequently remove any physician who was unable to perform competently.

*Corleto* relied on *Fiorentino v. Wenger*, 19 N.Y.2d 407, 280 N.Y.S.2d 373, 227 N.E.2d 296 (App. Div. 1967), which involved the death of a patient after he underwent a new type of surgical procedure. The court held that there would be no liability on the hospital for the physician's act unless the plaintiff could prove that the surgery itself was a *per se* act of negligence. The court, however, also noted that:

It should be evident that a hospital generally cannot be held liable, other than derivatively, for another's malpractice. Thus, where, as here, there is no vicarious liability, the plaintiff must establish that the hospital, through its own agents, was guilty of malpractice or other tort concurring in causing the harm. *Where a hospital's alleged misconduct involves an omission to act, the hospital will not be held responsible unless it had reason to know that it should have acted within the duty it concededly had. . . .* As Mr. Justice Lazansky noted, dissenting in the Appellate Division in the *Hendrickson* case. . . . [*Hendrickson v. Hodkin, et al.,* 276 N.Y. 252, 256, 11 N.E.2d 899, 901, *rehearing* 250 App. Div. 619, 294 N.Y.S. 982 (1937)]: "[A hospital] is not required to pass upon the efficacy of treatment; it may not decide for a doctor whether an operation is necessary, or, if one be necessary, the nature therof [*sic*]*; but it owes to every patient whom it admits the duty of saving him from an illegal operation or false, fraudulent, or fictitious medical treatment."* (250 App. Div., p.

hospital itself is the reasonable exercise of that standard of care which is maintained by the average practitioner or institution in the same class or professional calling, acting under the same or similar circumstances. Therefore, for Misericordia to be liable here, it must have failed to exercise that degree of care and skill usually exercised or maintained by other reputable hospitals in similar situations. *Mossey v. St. Luke's Hospital, et al.,* 63 Wis.2d 715, 720–1, 218 N.W.2d 514, 516–7 (1974) ; *Shier v. Freedman,* 58 Wis.2d 269, 283–4, 206 N.W.2d 166, 174 (1973) ; *Schuster v. St. Vincent Hospital of the Hospital Sisters of the Third Order of St. Francis Sisters,* 45 Wis.2d 135, 142–3, 172 N.W.2d 421, 424 (1969).

There was abundant expert testimony in this case regarding the procedures utilized by hospital committees to check a physician's references upon application for staff privileges, and the ease with which Misericordia could have had access to Dr. Salinsky's records. Once

621, 294 N.Y.S., p. 984.) [Citation omitted, *Fiorentino, supra* 227 N.E.2d at 299–300.] [Emphasis supplied.]

The most recent case regarding institutional liability is *Gonzales v. Nork & Mercy Hosps.,* No. 228566 (Super. Ct. of Cal., Sacramento County, filed Nov. 19, 1973), *rev'd and remanded on other grounds sub nom., Gonzales v. Nork,* 60 Cal. App.3d 728, 131 Cal. Rptr. 717 (1976), which received a great deal of publicity when released. Although the decision was rendered at the trial level, and lacks the authority of an appellate ruling, it is important because of its comprehensiveness and specificity with regard to a hospital's duty to create a mechanism by which it may discover inadequacies of its staff members. The *Nork* decision, like *Corleto,* relied heavily on *Fiorentino, supra,* and liability was predicated on the hospital's failure to have a system by which it could obtain knowledge of the quality of a practitioner's performance before and after admission to the staff.

The thrust of the above-mentioned cases is obviously to require hospitals to closely monitor admission to the medical staff, and, if warranted, to revoke or limit privileges already extended.

having obtained such records, Dr. Salinsky's incompetence would have been apparent to the executive committee of Misericordia Hospital.

Mr. Charles Taylor, hospital administration consultant with the Wisconsin Department of Health, testified that the most generally followed procedure is for a credentials committee or medical staff body to contact either the administrators or chiefs of staff listed as references on a physician's application. Decisions as to medical staff privileges are thereafter based on education, previous experience and background.

Walter Harden, executive director of Family Hospital and a board member of the Wisconsin Hospital Association, testified that he was very familiar with the "credentials process" among hospitals in the Milwaukee area. He explained that the purpose of the "credentials process" was to determine and evaluate past affiliations, check the veracity of an applicant's statements and to ascertain performance levels by means of peer review. He testified that requests for information regarding physicians as part of the "credentials process" were routinely received and complied with. Finally, Mr. Harden testified that a hospital exercising ordinary care, if presented with the facts of this case, would not have granted Dr. Salinsky medical staff privileges.[11]

---

[11] MR. BLOCH:

Q All right, and I'm not talking about the very worst hospital or the very best hospital, but I want you to assume those standards which are generally acceptable and generally used by hospital[s], if a physician were applying in 1973 for orthopedic privileges to do hip surgery and that hospital had properly investigated the application and that hospital determined another hospital only a few months earlier had revoked and totally suspended the right to do hip surgery, based upon a review of a committee of orthopedic surgeons and that hospital further knew that association that he had with Milwaukee Hospital does not involve hip surgery, by that I mean the Mount Sinai record, do you have an opinion

Harriet Sorrin, assistant administrator at Mount Sinai Hospital in Milwaukee, indicated that hospitals cooperated in expediting reference requests, and stated that the contents of a physician's file as to privileges and hospital involvement were generally available.

Arthur Schmid, Jr., the attorney for St. Anthony Hospital, testified regarding the procedures involved in processing a request for medical staff privileges, and produced St. Anthony's record of an application made by Dr. Salinsky in 1971 which was rejected. St. Anthony's records indicated the scope of investigation of Dr. Salinsky's application and reflected the subsequent refusal by the credentials committee to authorize his admission to orthopedic privileges based on the information received.

Misericordia objects to the introduction of Mr. Harden's testimony regarding the restrictions imposed on Dr. Salinsky's practice at Doctors Hospital and to the introduction of Doctors Hospital medical executive committee reports dealing with the investigation and suspension of Dr. Salinsky's privileges. Misericordia similarly objects to the admission of testimony by the attorney for St. Anthony Hospital regarding the hospital's refusal to allow Dr. Salinsky on the staff. Finally, defendant objects to the introduction of documents concerning the action of the credentials committee of St. Anthony Hospital in regard to Dr. Salinsky's application.

---

if a hospital acting reasonably would have allowed that physician the right to do hip surgery?

. . . .

A My opinion, the hospital acting under those circumstances with that information would not have appointed him to their staff and would not have granted him those privileges.

MR. BLOCH:

Q Is that your opinion to a reasonable degree of hospital administration probability?

A Yes sir, . . . .

The objections to the introduction of the minutes and records are based on hearsay. The trial court received the documents into evidence under the hearsay exception for records of regularly conducted activities. Sec. 908.03(6), Stats. The trial court also noted that even if such records constituted medical opinions, they were not admitted to establish the truth of the opinions, but to show that such opinions did exist and should have been considered by those investigating Dr. Salinsky's application. We affirm the trial court.

Hearsay evidence is generally excluded as untrustworthy; lacking the traditional guarantees of oath, confrontation and cross-examination for the credibility of the out-of-court declarant. Thus hearsay rests its value upon the credibility of the out-of-court declarant. Misericordia claims that for these reasons, the individuals who comprised the committees and conducted the investigation leading to restriction and denial of staff privileges should have been present to testify. Nevertheless, Misericordia made no effort to prove the untruthfulness of the reports or to challenge the trustworthiness of physicians involved.

We note that McCormick, in his treatise on evidence,[12] has discussed the disadvantage of excluding such evidence and advocates the approach we adopt.[13]

Thus evidence as to the purport of "information received" by the witness, or a statement of the results of investigation made by other persons, offered as evidence of the facts asserted out of court, have been held to be

---

[12] McCormick, *Evidence* §249 at 592–3 (2d ed. 1972).

[13] *See also Nail v. State*, 231 Ark. 70, 328 S.W.2d 836 (1959) where the court allowed into evidence a composite report, compiled from the findings of fourteen state hospital physicians. The report was held admissible despite the defendant's objection that he had no opportunity to examine the unnamed persons whose findings were included in the report.

hearsay. While in theory this approach may be applicable to such situations as the collective decision of a group of doctors, reached after consultation, the result is either the loss of valuable and reliable data or extreme awkwardness in presenting it. It is suggested that the hearsay ban ought not to apply either on the theory that cross-examination requirements are satisfied by the availability of one of the participants in the joint decision, or by analogy to the view that expert opinions may be based in part on observed data and in part on reports by others. [Footnotes omitted.]

We again assert that Misericordia could have subpoenaed the individual committee members if indeed the truth of the reports was in question. This was its prerogative, which it failed to exercise. Based upon the facts as incorporated in this record, we affirm the trial court's receipt into evidence of the committee reports regarding Dr. Salinsky's professional competence. The reports were properly considered by the jury as evidence of the type of information available to Misericordia at the time of Dr. Salinsky's application for staff privileges.

The evidence concerning the "credentials process" was admissible to show the existence of information regarding Dr. Salinsky's professional qualifications and the availability of such knowledge to Misericordia's medical executive committee. Thus Misericordia should have known of the restrictions placed on Dr. Salinsky's practice by other Milwaukee hospitals and that one hospital had denied him staff privileges. Once admissible for the purpose of showing the existence and availability of information, Misericordia's remedy at trial was to ask for a limiting instruction pursuant to sec. 901.06, Stats., if it believed that the evidence was to be used to establish Dr. Salinsky's incompetence.

There is no basis for the objection interposed with respect to the testimony of Mr. Harden and Mr. Schmid inasmuch as both men testified to matters within their

knowledge and experience. They both testified that they were familiar with the "credentials process" in Milwaukee in 1973.

Misericordia also objects to the introduction into evidence of the testimony of Dr. Nesemann that between the years of 1967 and 1975, he had heard other physicians state that "Dr. Salinsky was incompetent as an orthopedic surgeon."[14] The trial court allowed the testi-

[14] MR. BLOCH:

Q Dr. Nesemann, back in 1972 and '73, did you form an opinion or have an opinion as to Dr. Salinsky's reputation for competency to do orthopedic surgery?

A Yes, sir.

Q And what was that opinion, as to what his reputation was?

A My opinion, and this is based upon personal experience with, and I have to say some—I can't cite cases, I do not have that recall, but I had occasion to deal with, and my residents had occasion to deal with, that I had an opinion that they were not the work of a competent orthopedic surgeon. I had knowledge which I cannot substantiate that he was not a qualified orthopedic surgeon in the first place, that he was never trained as a qualified orthopedic surgeon. This information that I had was gained in discussion with the majority of orthopedic surgeons as I stated, discussions in the Milwaukee Orthopedic Club, discussions at various meetings, discussions at teaching groups, discussions and conferences, Milwaukee County Hospital, Children's Hospital, that he was neither qualified through training or not qualified by—or at least experienced, and what not, I have to say virtually all agreement of, and this would represent a majority of orthopedic surgeons in this community, that he was not qualified by virtue of training or by virtue of demonstration, if you will.

Q That's what you knew other orthopedic surgeon—

A That's correct.

Q Thought.

A That's what I understood to be the consensus of opinion of the vast majority of orthopedic surgeons in the Milwaukee area.

mony under secs. 904.04 and 904.05, Stats.[15] We agree that the evidence was properly admitted, but on different grounds. Where the action is for malpractice of a physician, and the question is whether he did a particular act involving unskillful or improper methods, habitual qualities, if properly evidenced by repute are relevant and admissible as indicating the physician's probable conduct. It is skill and training that we are dealing with here, and not habit or moral trait. Therefore, the char-

---

[15] 904.04 Character Evidence Not Admissible To Prove Conduct; Exceptions; Other Crimes. (1) Character Evidence Generally. Evidence of a person's character or a trait of his character is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion, except:

(a) *Character of accused.* Evidence of a pertinent trait of his character offered by an accused, or by the prosecution to rebut the same;

(b) *Character of victim.* Except as provided in s. 972.11(2), evidence of a pertinent trait of character of the victim of the crime offered by an accused, or by the prosecution to rebut the same, or evidence of a character trait of peacefulness of the victim offered by the prosecution in a homicide case to rebut evidence that the victim was the first aggressor;

(c) *Character of witness.* Evidence of the character of a witness, as provided in ss. 906.07, 906.08, and 906.09.

(2) Other Crimes, Wrongs, or Acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. This subsection does not exclude the evidence when offered for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

904.05 Methods of Proving Character. (1) Reputation or Opinion. In all cases in which evidence of character or a trait of character of a person is admissible, proof may be made by testimony as to reputation or by testimony in the form of an opinion. On cross-examination, inquiry is allowable into relevant specific instances of conduct.

(2) Specific Instances of Conduct. In cases in which character or a trait of character of a person is an essential element of a charge, claim, or defense, proof may also be made of specific instances of his conduct.

acter rule is not involved. 1 Wigmore, *Evidence* §67 at 487 (3d ed. 1940). *See also Baker v. Borello,* 136 Cal. 160, 68 P. 591 (1902). As indicating the likelihood of a person doing or not doing an act in question, evidence of lack of technical skill is of probative value.

The considerations that have led to exclusion of such facts in a few instances have usually been considerations affecting some other use or aspect of the evidence, with which the present use was confounded. Thus, the rules against the use of a party's character as evidence . . . have sometimes been thought to require exclusion of facts wrongly construed as equivalent to character. Again, the rule against using an accused person's specific misconduct to show character . . . , and limiting such misconduct, when used to show intent, by strict conditions . . . , may sometimes be thought to operate against the fact of possession of criminal tools or other means. The general impropriety of using against an accused person either character, or specific misconduct to show character, is so constantly in the mind of Courts that they occasionally ignore the possibilities of evidence from the present point of view, and, by a wrong construction of the purpose of the evidence, feel bound to apply to it exclusionary rules that have no concern with it. This much must be kept in mind as a key to rulings which are otherwise inexplicable and ought not to stand as precedents.

As a general principle, then, the *existence or lack of the physical capacity, skill, or means* to do an act is admissible as some evidence of the possibility or probability of the person's doing or not doing it: 1 Wigmore, *supra* §83 at 513 [Footnote omitted.] [Emphasis in original.]

Again, as above, this evidence was admissible for the purpose of showing the availability of knowledge concerning Dr. Salinsky's competence. If counsel for Misericordia thought this evidence might be used for an improper purpose, a limiting instruction should have been requested pursuant to sec. 901.06, Stats.

Finally, Misericordia objects to the judicial notice taken by the trial court of ten malpractice suits filed against Dr. Salinsky.[16] The trial court allowed the evidence of such actions for the following reason:

If this many claims (10 in number) actually found their way into the suit process, Misericordia had the further obligation to study, inspect and question Dr. Salinsky regarding each court case. Whatever the case, the individual outcome of any claim or suit is of no relevancy, but the presence of these actions constitute a "red flag" which was discoverable to anyone who made the slightest inquiry. Even Dr. Maxey [a member of the medical executive committee at Misericordia Hospital] admitted that although he would not be impressed by any number of malpractice cases, he certainly would be interested in reviewing the facts of any particular case. He could not even do that unless the existence of the claims was made known.

Misericordia argues that because the record contains no indication that the facts of the previous occurrences were the same or substantially similar to the one in question, such evidence was not relevant. Misericordia also denies that the existence of such claims was a basis

[16] It should be noted that one of these actions was filed after July 10, 1975 and arose out of an incident which occurred following Dr. Salinsky's appointment to the staff. The court also received evidence of an incident report relating to Dr. Salinsky's conduct during a procedure in 1974 in which a nurse complained that he was invading a sterile wound with his bare hands.

At trial, plaintiff argues that these two evidentiary items were relevant in light of the statement made by Misericordia's counsel during opening statements: "No incident regarding Dr. Salinsky's conduct was reported to the administration at any time between his being granted privileges and the plaintiff's operation." The court allowed the evidence on the ground that "plaintiff had the right to negate that assertion, and did so quite successfully." This same issue is not pressed on appeal and we will, therefore, consider the notice of the nine malpractice actions filed prior to July 10, 1975.

for constructive notice of Dr. Salinsky's professional incompetence.

This issue was raised in *Purcell v. Zimbelman, supra.* Plaintiff there also attempted to introduce evidence of prior actions against the physician. The court allowed the introduction of the evidence although the acts of negligence were not of the same nature.

Since the negligence of the hospital was predicated upon failure to perform its obligation to Zimbelman to see to it that only professionally competent persons were on its staff, it follows that its knowledge, actual or constructive, of Dr. Purcell's shortcomings, was an essential element for consideration in determining whether or not the hospital exercised reasonable care or had been guilty of negligence. Where knowledge of a danger is an issue, evidence of the occurrence of other accidents or injuries from the doing of a particular act or the employment of a particular method on occasions prior to the one in question is admissible to show that the person charged knew or should have known of the danger therein, provided it is shown that the conditions of the previous occurrences were the same or *substantially similar* to those of the one in question. *It is not necessary however, to show that such incidents occurred under circumstances precisely the same as those of the one in question—similarity in general character* suffices. [Citation omitted.] [Emphasis supplied.] *Purcell, supra,* 500 P.2d at 343.

The admissibility of the reputation evidence and the judicial notice of other malpractice actions is an admixture of similar events testimony and availability of knowledge testimony and it was within the discretion of the trial court to admit such testimony. The Wisconsin Supreme Court has held that a trial court has considerable discretion in determining whether an offered item of evidence is relevant to the issues in a case.[17] We do

[17] In *Netzel v. State Sand & Gravel Company,* 51 Wis.2d 1, 9–10, 186 N.W.2d 258, 263 (1971), the Wisconsin Supreme Court relied on 1 Jones, *Evidence* §185 at 324 (5th ed.):

not believe that discretion was abused here nor that the issues raised were irrelevant. Both the purpose for which the evidence was introduced and the nature of the negligence claimed were considered in determining whether the evidence should have been admitted.[18] We agree that the evidence was necessary in order for the jury to determine whether Misericordia should have known of Dr. Salinsky's incompetence before admitting him to staff privileges.

Misericordia contends that in order to prove a breach of a duty on its part, the plaintiff must establish by expert testimony that Dr. Salinsky was incompetent to practice orthopedic surgery prior to the operation of July 10, 1975. This argument misses the point. The history of Dr. Salinsky's professional restrictions and rejections at other Milwaukee hospitals, and the character and reputation evidence introduced, establish the fact that Dr. Salinsky's professional competence was in question in the medical community at the time of his application for staff privileges at Misericordia. Our concern is with the availability of information regarding Dr.

"Since evidence of other similar conditions or occurrences under similar circumstances involves proof of collateral matters, a good deal of discretion is necessarily vested in the trial judge on the question of whether the evidence should be admitted. The usual considerations of undue distraction or prejudice, surprise, or undue consumption of time are inherent. . . ."

[18] *Id.* at 10 n. 18, 186 N.W.2d at 263 n. 18:

"There is no rule of law, however, which prevents the trial of collateral issues, since the objection thereto is purely a practical one, and the general rule is that the admission of evidence of similar acts or occurrences as proof that a particular act was done or that a certain occurrence happened, rests largely in the discretion of the trial court, . . ." 32 C.J.S., *Evidence* §578, page 703.

*Accord, City of Franklin et al. v. Badger Ford Truck Sales, Inc.,: Ford Motor Car Company,* 58 Wis.2d 641, 616–7, 207 N.W.2d 866, 873 (1973); *Chart v. General Motors Corporation,* 80 Wis.2d 91, 102–3, 258 N.W.2d 680, 684 (1977).

Salinsky's professional skill. This court faces a situation wherein a hospital allowed a physician to use its facilities when its governing body knew, or in the exercise of reasonable care should have known, that the physician was considered incompetent by his peers. We must stress that this is not a situation where an approved and competent staff physician committed a negligent act of which the governing body could not have had any prior knowledge. Rather, this is a situation wherein the jury had a right to find that had Misericordia, in the exercise of due care, checked Dr. Salinsky's credentials, it would or should have rejected his application for admission to the staff. Under such circumstances, expert evidence of negligent medical acts was unnecessary. Expert evidence concerning the "credentials process" carried on by hospitals in evaluating physicians for staff privileges was necessary and was available here.

In establishing the negligence of a hospital the necessity for expert testimony depends upon the type of negligent acts involved. Expert testimony should be adduced concerning those matters involving special knowledge or skill or experience on subjects which are not within the realm of the ordinary experience of mankind and which requires special learning, study or experience. *Froh v. Milwaukee Medical Clinic, S.C., et al.*, 85 Wis.2d 308, 318, 270 N.W.2d 83, 87 (Ct. App. 1978).

Here, the trial court correctly instructed the jury that a hospital is under a duty of reasonable care to permit only competent physicians to use their facilities and correctly defined reasonable care as that degree of care, *skill* and judgment usually exercised under like or similar circumstances by the average hospital.[19] Testimony

[19] Question No. 3 of the Special Verdict inquires whether the defendant, Misericordia Community Hospital, was negligent in granting of orthopedic surgical privileges to Lester V. Salinsky, M.D.

clearly established the degree of care exercised by other hospitals in regard to the credentials process. *See also, Purcell, supra,* 500 P.2d at 341.

Misericordia further denies any breach of duty because it contends plaintiff did not prove that the hospital had *actual* notice of Dr. Salinsky's incompetence. We must disagree. Under the rule which Misericordia would have us adopt, a simple denial of knowledge would pro-

You are instructed that it was the duty of the defendant, Misericordia Community Hospital, in investigating the application of Lester V. Salinsky, M.D. and in determining what, if any, privileges should be granted to him to exercise the degree of care, skill, and judgment which is usually exercised by hospitals under like or similar circumstances.

AS TO QUESTION #3:

A hospital is under a duty to exercise reasonable care to permit only competent medical doctors the privilege of using their facilities.

By competent doctor is meant a doctor possessed of the skill and judgment that orthopedic doctors would recognize that an orthopedic doctor must have in order to perform the orthopedic privileges he requested without creating an unreasonable risk of injury to others.

By reasonable care is meant that degree of care, skill and judgment usually exercised under like or similar circumstances by the average hospital.

In answering Question 3 you are instructed that the defendant hospital has a duty to comply with the provisions of the Wisconsin Administrative Code in the manner in which physicians are selected for appointment to the medical staff and in defining the extent of their privileges. One provision of the code . . . provides that members of the staff shall be qualified legally, professionally, and ethically for the positions to which they are appointed. In order to comply with this requirement, the hospital is required to have a system based upon definite workable standards to evaluate each applicant by its credentials committee, or if a small hospital, by a committee-of-the-whole. This same rule provides that criteria for selection and the granting of requested privileges shall be individual character, competence, training, experience and judgment.

If you find that Misericordia Hospital violated the provisions of these rules, then you are required to answer Question No. 3 yes.

vide a good defense. Moreover, it would promote carelessness and ignorance on the part of hospitals, as the less a hospital would know about a physician it admits to its staff, the safer and more immune it would be against any charges of negligence. We suggest, however, that the welfare of patients could be further safeguarded if legislative or administrative action would require a system whereby information could be disseminated regarding a physician's restriction or denial of staff privileges. Such a system would necessarily be invoked only after a physician had been afforded his due process rights and had exhausted all possible legal remedies.

Misericordia here had constructive knowledge of the circumstances regarding Dr. Salinsky. "Constructive knowledge is that knowledge which one who has the opportunity, by the exercise of ordinary care, to possess. It is somewhat, though not entirely, akin to constructive notice." *Attoe v. State Farm Mutual Automobile Insurance Company, et al.*, 36 Wis.2d 539, 546, 153 N.W.2d 575, 579 (1967). In *Zdunek v. Thomas*, 215 Wis.11, 15, 254 N.W. 382, 383 (1934), the Wisconsin Supreme Court held:

It is a general rule of law sustained by the authority of many cases that whatever fairly puts a person on inquiry with respect to an existing fact is sufficient notice of that fact if the means of knowledge are at hand. If under such circumstances one omits to inquire, he is then chargeable with all the facts which, by proper inquiry, he might have ascertained. *Melms v. Pabst Brewing Co.*, 93 Wis. 153, 165, 66 N.W. 518, 20 R.C.L. p. 346, §7, and cases cited.

The matter of knowledge or means of knowledge is dealt with in the Restatement of the Law of Contracts, sec. 180, comment *f*:

"A person has 'reason to know' a fact when he has such information as would lead a person exercising reasonable care to acquire knowledge of the fact in question or to infer its existence."

If a person confronted with a state of facts closes his eyes in order that he may not see that which would be visible and therefore known to him if he looked, he is chargeable with "knowledge" of what he would have seen had he looked. A person by closing his eyes for the purpose of preventing knowledge by that act brings himself within the field of knowledge as that term is used in the law. Therefore the trial court correctly held that if the defendant desisted from inquiry for the reason that she suspected that a situation existed which she did not wish to be aware of, she brought herself within the field of knowledge as to those matters which a reasonably careful inquiry would have disclosed.

Misericordia cites one case in support of its position, *Hull v. North Valley, supra.* There a patient sued the hospital after his condition was misdiagnosed and he was improperly treated for a knee ailment. The facts differ somewhat from those before us in that the negligent physician's conduct and professional practices had been reviewed by the medical staff and at various times his privileges to do surgery had been revoked and then reinstated. Thus, *Hull* deals with a situation wherein a hospital had fully investigated a physician's credentials and approved his practice. The court framed the issue as follows: "Is the Hospital negligent under the ordinary rules of negligence for not limiting or expelling the doctor *before the fact* of the case of malpractice, and excluding any reference to the malpractice itself except in damages?" *Hull, supra* 498 P.2d at 143. After rejecting the plaintiff's claim of liability, based on failure of proof, the court noted:

Assuming that the Board of Directors of the hospital entity has a duty to "act" when put on notice or advised by the medical section that a doctor is incompetent to continue to practice medicine, the law recognizes that

this determination must be made by medical personnel skilled in medical sciences and competent to make this determination. In this case that was not done by the medical section or communicated to the proper Hospital authority. Kauffman's prior limitation and reinstatement in 1967, cannot be considered as negligence on this record, which fails to reveal facts at that hearing that would constitute improper procedures by the Board of Directors or that it acted contrary to medical advice.

. . . .

The record insofar as the Hospital is concerned, demonstrates an effort to supervise the quality of medical practice within the Hospital. *Hull, supra* 498 P.2d at 143–4.

We do not agree that *Hull* supports Misericordia's position. Rather, the Montana court in *Hull* appears to advance the rule that a hospital is responsible for scrutinizing a physician's credentials. One other jurisdiction has similarly interpreted the *Hull* decision: "[I]t seems clear that the Montana court was quite willing to find an independent duty of care running from the hospital to the patient." *Corleto, supra* 350 A.2d at 537.

The facts before us are clear. Misericordia did not attempt any investigation regarding Dr. Salinsky's application. Ms. Bekos, medical staff coordinator of Misericordia from 1973–77, testified that as part of her responsibilities she was to contact other hospitals regarding physicians' credentials upon application for staff privileges. She testified that she was unable to locate any records in regard to such activities with respect to Dr. Salinsky's application. Mr. Harden also testified that Misericordia never requested any information regarding Dr. Salinsky. Misericordia simply takes the position that Dr. Salinsky was qualified to be on the staff because: "Doctor Maxey testified that [the medical executive committee] determined Doctor Salinsky's training, experience, and demonstrated competency was suffi-

cient to justify the granting of staff privileges and, therefore, there would be no further duty on the part of the hospital in that respect, and no negligence on the hospital as a matter of law." We disagree and find a breach of the duty required as set out above.

## III. CAUSATION

There can be no liability predicated upon a breach of duty unless it is determined that such breach was a legal cause of the plaintiff's injuries. The test of cause-in-fact in Wisconsin is whether the defendant's negligence was a substantial factor in contributing to the harm from which damages are claimed.[20] The phrase "substantial factor" indicates the effect of the defendant's harm in leading a trier of fact, acting as a reasonable person, to regard it as a cause, using "cause" in the popular sense. *Merco Distributing Corporation v. Commercial Police Alarm Company, Inc.*, 84 Wis.2d 455, 459, 267 N.W.2d 652, 654 (1978). Causation is a fact; the existence of causation is an inference to be drawn from the circumstances by the trier of fact. *Jagmin v. Simonds Abrasive Company*, 61 Wis.2d 60, 82, 211 N.W. 2d 810, 822 (1973). There may be more than one cause of an injury. The negligence of one party may cause an injury or the combined negligence of two or more

[20] Legal cause is made up of two components, cause-in-fact and "proximate cause," or policy considerations. *Morgan v. Pennsylvania General Insurance Co., et al.*, 87 Wis.2d 723, 735, 275 N.W. 2d 660, 666 (1979); *Howard v. Mt. Sinai Hospital, Inc., et al.*, 63 Wis.2d 515, 517–19, 217 N.W.2d 383, 385 (1974); Restatement (Second) of Torts, §431 (1965). Under the test for cause-in-fact there can be more than one substantial factor contributing to the same result and, therefore, more than one cause-in-fact. *Hart v. State*, 75 Wis.2d 371, 397, 249 N.W.2d 810, 822 (1977). *See also Pfeifer, et al. v. Standard Gateway Theater, Inc.*, 262 Wis. 229, 55 N.W.2d 29 (1952).

parties may cause it. Thus one who negligently creates a dangerous condition cannot escape liability for the natural and probable consequences of an act although an act of a third person contributes to the result. *Pfeifer, et al. v. Standard Gateway Theater, Inc.,* 262 Wis. 229, 236–8, 55 N.W.2d 29, 33 (1952). One party's act need not be the sole or primary factor, but only a substantial factor for liability to attach. *Schnabl v. Ford Motor Co.,* 54 Wis.2d 345, 353–4, 195 N.W.2d 602, 607 (1972).

The question on appeal is whether there is any credible evidence, which under any rational view fairly admits of an inference which will support the jury's findings. *Roach v. Keane,* 73 Wis.2d 524, 536, 243 N.W.2d 508, 517 (1976); *Toulon v. Nagle,* 67 Wis.2d 233, 226 N.W.2d 480 (1975).

Misericordia argues that causation was not established here because even if it had refused Dr. Salinsky staff privileges, the harm still would have occurred because Dr. Salinsky would have performed the surgery at West Side Hospital.[21] We are not convinced that the same

[21] Misericordia relies on Restatement (Second) of Torts §432 (1964) for its argument that it should not be held liable for plaintiff's injuries because the harm complained of would have occurred despite any action Misericordia may have taken.

(1) Except as stated in subsection (2), the actor's negligent conduct is not a substantial factor in bringing about harm to another if the harm would have been sustained even if the actor had not been negligent.

Comment (b) states:

The statement in this subsection is most frequently, although not exclusively applicable where the actor's tortious conduct consists in a failure to take some precautions which are required for the protection of another's person or land or chattels. In such case, if the same harm, both in character and extent, would have been sustained even had the actor taken the required precautions, his failure to do so is not even a perceptible factor in bringing it about and cannot be a substantial factor in producing it.

Defendant continues in his brief:

Therefore, even if it were determined that the hospital was negligent in allowing Doctor Salinsky to use its facility to perform

harm, in both extent and character, would have occurred if Dr. Salinsky had been prevented from performing plaintiff's surgery at Misericordia. Misericordia urges that we deny causation and liability on the ground of a possibility and cites the Restatement (Second) of Torts §432 as authority. The Restatement, however, does not speak in terms of a possibility as a basis on which to deny causation, but refers to situations where the harm *would have* occurred. It is here that defendant's case must fail.

Misericordia introduced no proof that Dr. Salinsky was on West Side's staff. Such affiliation was certainly not listed on his application to Misericordia, and proof of such affiliation would be a prerequisite to defendant's present argument. Dr. Salinsky himself could not state when he joined West Side and only testified that he "believed" he would have been permitted to perform the disputed surgery there. Moreover, Dr. Salinsky testified that he had restrictions on his surgical privileges at West Side as far as hip replacements. Other restrictions may or may not have been in effect. Misericordia has made a bold statement of defense, and failed to substantiate it. The jury did not believe this argument, nor do we. To permit this defense would serve to allow any defendant to isolate itself from liability on the ground that "it would have happened anyway." The Restatement does not contemplate such a

the operation on the plaintiff, it would not be a cause of the plaintiff's injury as a matter of law, because the same harm, both in character and extent, would have been suffered by the plaintiff, as the operation would have been performed at West Side Hospital.

A mere possibility of causation is not enough. When the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant, *Merco Distributing v. Commercial Police Alarm*, 84 Wis.2d 455, 267 N.W.2d 652 (1978).

broad application of the principle at issue, and public policy will not condone it. Therefore, the trial court did not err in refusing Misericordia's request to instruct the jury that:

A causal relationship between the negligence of the hospital in granting Doctor Salinsky permission to use its facilities and the injury and damage to the plaintiff exists if it has been proved to your satisfaction that if Doctor Salinsky had not been permitted to use the hospital facilities that the operation which was performed on the plaintiff on July 10, 1975, would not have been performed by him at some other hospital.

The defendant hospital in *Purcell, supra* raised identical arguments regarding Dr. Purcell's negligence. The hospital argued that even if Dr. Purcell had been suspended for six months after the first incorrect "pull through" operation, it was still probable that the *Zimbelman* case would have occurred exactly as it did.[22] The court did not agree:

[22] The hospital argues that Zimbelman failed to prove that it caused his injuries because there was no showing as to what action the hospital would have taken with respect to Dr. Purcell. It contends that ". . . if the hospital should have suspended Dr. Purcell in the Hill case, then a suspension could have lasted for a period of six months. Let us assume that the hospital restricted Dr. Purcell for a six-month period and not let him perform any surgery on diverticulitis during that time. If that had happened, then according to Dr. Griess the hospital would have performed whatever duties to the public that it had. Yet, even if that restriction had taken place, it is still entirely possible and probable that the Zimbelman case would have occurred exactly as it did occur. The Blickley and Hill cases were over in 1965, and therefore a six-month or even a three-year suspension would have been terminated by the time Henry Zimbelman presented himself to Tucson General Hospital."

The hospital further maintains, since after the Hill and Blickley cases Dr. Purcell recognized that the proper way to handle diver-

Although a mere possibility of such causation is not enough, the plaintiff is not required to prove his case beyond a reasonable doubt and he need not negate entirely the possibility that defendant's conduct was not a cause. . . . All that is required in negligence cases is for the plaintiff to present probable facts from which negligence and causal relations may be reasonably inferred.

. . . .

We believe it reasonably probable to conclude that had the hospital taken some action against Dr. Purcell, whether in the form of suspension, remonstration, restriction or other means, the surgical procedure utilized in this case would not have been undertaken by the doctor and Mr. Zimbelman would not have been injured.

Since the question of causation in fact is for the trier of fact, the court did not err in submitting it to the jury. [Citations omitted.] *Purcell, supra,* 500 P.2d at 342–3.

Misericordia also argues that public policy should cut off any liability here, because it claims in its brief that the plaintiff's injury was too "wholly out of proportion to the culpability of the negligent tortfeasor. . . ." We do not agree. The case on which defendant relies, *Howard v. Mt. Sinai, supra* note 20, dealt with a fear or phobia of future cancer which resulted from a negligent act. Liability was denied on the basis of the remoteness of the damages. Other cases cited by the court in *Howard v. Mt. Sinai* involved equally remote damage situa-

ticulitis was by anterior resection and had performed some anterior resections, that ". . . once it would have become clear to any hospital department or committee that a problem in the Hill or Blickley case had been cleared up—that Dr. Purcell now realized that a diseased portion of the bowel must be taken out— then obviously there would have been no reason to continue any such suspension because of the Blickley and Hill cases." We do not agree with the hospital's contention. *Purcell, supra,* 500 P.2d at 342.

tions.[23] In this case, the damages are not remote and liability is not out of proportion to the negligent act. Misericordia consciously disregarded the welfare of patients who came to the hospital for treatment. One of the basic tenets of a hospital's existence is to provide optimal patient care. When a hospital negligently fails to exercise reasonable care in selecting physicians for appointment to its staff, it fails in its responsibility to patients and violates the very purpose for which it was established. Patients necessarily rely on hospitals to monitor the quality of care rendered in their facilities. While hospitals cannot be liable for the acts of independent contractors over whom they have no right of control, necessarily and "[w]ithout regard to the absence of any legal liability, the hospital *in admitting a physician or surgeon to its facilities* extends a moral im-

---

[23] [W]e have held a defendant not liable for injuries sustained solely by fear for another's safety without physical impact. [*Klassa v. Milwaukee Gas Light Co.* (1956), 273 Wis. 176, 77 N.W.2d 397.] Again on public policy grounds, we have held a plaintiff, hit on the arm by a flying object, not liable for his contributory negligence in driving with his arm out the window. [*Schilling v. Stockel* (1965), 26 Wis.2d 525, 133 N.W.2d 335.] In these and other cases, [*See: Longberg v. H. L. Green Co.* (1962), 15 Wis.2d 505, 516, 113 N.W.2d 129, 114 N.W.2d 435; and *Colla v. Mandella,* 1 Wis.2d 594, 598–9, 85 N.W.2d 345 (1957)] on public policy grounds, we have refused to impose liability where such imposition of liability would offend sound considerations of public policy. [*Hass v. Chicago & North Western Ry. Co.,* [48 Wis.2d 321, 326–7, 179 N.W.2d 885 (1970)] quoting *Colla v. Mandella, supra* . . . at pages 598, 599.] Today in the *Reshan Case* [*Reshan v. Harvey,* 63 Wis.2d 524, 217 N.W.2d 302] again we have refused to impose liability, on public policy grounds, where a conspicuously negligent northbound car on I-94 in Racine county went out of control and moved across the median strip hitting a car which was proceeding southerly on I-94 and the only negligence of the driver of the southbound car was with respect to maintaining an improper lookout for objects in the median strip. *Howard v. Mt. Sinai, supra* at 518, 217 N.W.2d at 385.

primatur to him in the eyes of the public." *Shulman v. Washington Hospital Center*, 222 F. Supp. 59, 64 (D.C. 1963). [Emphasis supplied.]

We, therefore, hold that the jury's determination that Misericordia was causally negligent is supported by credible evidence.

## IV. DAMAGES

Misericordia objects both to the apportionment of negligence, and to the amount of damages awarded the plaintiff by the jury. The jury assessed eighty percent of the causal negligence to Misericordia and twenty percent to Dr. Salinsky. The jury then determined that $315,000 compensated plaintiff for his past and future personal injuries, and awarded $90,000 for plaintiff's past and future loss of earning capacity.

In reviewing a jury's apportionment of negligence and its award of damages, this court will sustain the verdict where there is any credible evidence that under any reasonable view supports the verdict and removes the question from the realm of conjecture. *Coryell, et ux. v. Conn et al.*, 88 Wis.2d 310, 315, 276 N.W.2d 723, 726 (1979); *Sabinasz v. Milwaukee & Suburban Transport Corporation*, 71 Wis.2d 218, 222, 238 N.W.2d 99, 101 (1976). To upset a jury verdict, the appellant has a heavy burden and must show that there is such a complete failure of proof that the verdict could only be based upon speculation. *Ernst v. Greenwald*, 35 Wis.2d 763, 773, 151 N.W.2d 706, 711 (1967). This is especially true where the trial court has reviewed the verdict and sustained it over claims of excessiveness. *Peeples, et ux. v. Sargent, et al.*, 77 Wis.2d 612, 614, 253 N.W.2d 459,

471 (1977). Moreover, we will view the evidence in the light most favorable to the respondent.[24]

"Since it is for the jury, and not for the court, to fix the amount of the damages, their verdict in an action for unliquidated damages will not be set aside merely because it is large or because the reviewing court would have awarded less. Full compensation is impossible in the abstract, and different individuals will vary in their estimate of the sum which will be a just pecuniary compensation. Hence, all that the court can do is to see that the jury approximates a sane estimate, or, as it is sometimes said, see that the results attained do not shock the judicial conscience. . . ." *Bethke v. Duwe et al.*, 256 Wis. 378, 385, 41 N.W.2d 277, 280 (1950). [Quoting 15 Am. Jur. *Damages* §205 at 621.]

In *Ianni v. Grain Dealers Mutual Insurance Company*, 42 Wis.2d 354, 364, 166 N.W.2d 148, 153 (1969), the supreme court set out some general rules regarding determination of loss of earning capacity.

"One who is injured in his person may recover for any consequent . . . loss or diminution of his earning capacity. . . .

"The proper element of damages in such cases is loss of earning power; that is, the permanent impairment of the ability to earn money. . . .

"The burden is on the plaintiff to establish to a reasonable certainty the damages sustained.

"The jury is not allowed to speculate. . . .

". . . mere proof of a permanent injury is not conclusive evidence of impairment of future earning capacity. . . .

"There is no fixed rule for estimating the amount to be recovered for loss or diminution of future earning capacity. . . .

"The process of ascertaining the amount of compensation to be awarded requires (1) the determination of the

[24] The Wisconsin Supreme Court has often said it is only necessary to consider the evidence which sustains the jury verdict. *Sabinasz v. Milwaukee & Suburban Transport Corporation, supra* at 223, 238 N.W.2d at 102.

extent to which such capacity has been diminished, and (2) the fixing of the amount of money which will compensate for the determined extent of impairment.

"The extent of the diminution or impairment of earning capacity is generally to be arrived at by comparing what the injured party was capable of earning at or before the time of the injury with what he was capable of earning after it occurred. . . ."

This court does not find the apportionment before us to be based on speculation or conjecture and we are not shocked by the size of the verdict. We do not consider the award excessive in light of the following factual situation.

Dr. Nesemann, a qualified orthopedic surgeon testified on behalf of the plaintiff. Dr. Nesemann treated the plaintiff from April, 1976 to late in 1977 at Milwaukee County General Medical Complex. Plaintiff went to Dr. Nesemann with significant limitation of movement in both hip joints. The already compromised functional capacity of the right hip was further complicated by a lack of circulation to the right leg and paralysis as a result of interruption of one of the major nerves to the leg. At the time Dr. Nesemann saw the plaintiff, he was complaining of right leg pain and numbness in the thigh and lower leg with cramping upon walking six blocks. Physical examination showed absent femoral arterial pulses and a complete absence of nerve in that leg. The muscles were atrophied.

Plaintiff's past medical history showed that he had undergone surgery on December 10, 1969 for the insertion of Knowles pins into his right hip as treatment for capitofemoral epiphyses. Dr. Salinsky performed the surgery. Removal of the pins was attempted by Dr. Salinsky on July 22, 1970, but a portion of one of the pins had snapped off and it was decided to leave it where it was, i.e., embedded in the back of the femoral

head of the thigh bone.[25] On July 11, 1975, Dr. Salinsky attempted to remove the pin fragment because "[t]he patient noted that upon playing basketball, with coming up in the air, he would experience some degree of pain in the hip."

Dr. Nesemann testified to a reasonable degree of medical certainty that this last operation was negligently performed. Specifically, he testified that the records and an examination of the plaintiff showed that Dr. Salinsky attempted to reach the nail fragment embedded in the back of the bone by means of an incision over the front of the right hip when a posterior approach was indicated. Dr. Nesemann testified that no competent orthopedic surgeon would ever attempt such an approach given the location of the pin: "In no way could one remove that pin going in through an anterior approach without totally destroying the hip." Dr. Nesemann also testified that the injury to the nerve and artery was permanent[26] and definitely related to the July 11, 1975 procedure.[27]

---

[25] Plaintiff underwent surgery for capitofemoral epiphyses on the left hip on June, 1972. A Smith Peterson nail was used to secure the bone and at the time of trial was still in place. This surgery has no bearing on the issue before us.

[26]

A The functional disability would concern itself primarily with the paralysis of the quadriceps such that although with time he can learn to walk quite well, he uses gravity, he brings his hip forward and the inertia coming out, he locks the knee into extension, he won't be able to jump because he can't stabilize the knee, he can't climb because he can't stabilize the knee, it's such as it will collapse itself by a real balancing act by the knee, he cannot lock it into position, he won't be able to engage in any occupation with reference to the nerve that requires extended periods on his foot through the walking, primarily through the arterial injuries.

. . . .

A No, the limitation from neuro function means as I stated before that he can walk, his duration of walking is limited by gravitation because of the nerve injury, the nerve injury, however, limits to the most extent his participation in athletic activities, in

At the time of the surgery plaintiff was seventeen years old. At the time of trial he was 20 years old with a life expectancy of $46\frac{3}{10}$ years. The main blood supply to his right leg is permanently impaired and he has numbness in a substantial area of the thigh and lower calf due to the severed nerve. Photographs admitted into evidence show a great degree of atrophy or shrinkage to the leg muscles because of the nerve injury. Plaintiff testified to constant cramping and pain in his leg, and exhibited burns to his thigh which occurred as a result of his inability to feel hot cigarette ashes dropping on his leg. Plaintiff's activities are severely restricted and he can no longer participate in sports or sustained physical activity of any type. He had had to

activities which involve climbing, any anctivities [sic] let's say to preclude his participation in the military service, it would pretty much preclude any strenuous lifting and what have you, because the knee would tend to buckle frequently.

Q And do you have an opinion as to whether those impairments are permanent?

A Yes, sir, they're permanent.

Q Do you have an opinion as to whether the numbness in the area of the thigh and calves, whether or not this is permanent?

A That's permanent, just the same as the motor function, it's permanent.

A I had occasion to operate on Jim and to repair that nerve, you can't expect much return even say a year's gone by, we have a little bit of return in the vastis lateralis, but since the injury occurred in the branching portion, the chance of getting function back isn't a bright picture, but we spent a number of hours, certain at least a half a dozen, of operating time trying to take this nerve out of the scar tissue and the prior surgery and try to re-establish a conduction, although it works a little bit, I can say absolutely no doubt the injury is due to the prior surgery.

Q Which prior surgery?

A The only prior surgery, and that was the attempt to remove that pin from the anterior approach.

Q From the front?

A From the front.

learn a new way of walking by throwing out his hip. He cannot walk more than two blocks at a time. He has had to undergo additional surgery in an attempt to correct the damage which resulted from the negligently performed operation, and faces the prospect of further surgeries. The trial court, in its decision, aptly noted that:

Plaintiff's condition will be with him every waking moment of every day for the balance of his life. It affects everything that he will attempt to do. . . . The plaintiff's injury has left his life in limbo. His only definite plans after completing eleventh grade were to enter the army. That alternative has been taken away from him.

Misericordia raises several arguments that plaintiff's injuries are not as serious as claimed. First, Misericordia raises the fact that plaintiff would have suffered from degenerative arthritis in his hips despite the negligent surgery. Dr. Nesemann testified that while this was true, he was talking about "ultimately," *i.e.*, in a number of years. We are, therefore, dealing with a situation wherein a functioning adolescent, one who was playing basketball at the time of the surgery, was rendered less than functional by attempted corrective surgery.

Misericordia also contends that plaintiff could but is unwilling to undergo a bypass operation to improve the circulation and a muscle transplant to improve muscle activity. This is, in effect, a mitigation of damages argument. Dr. Nesemann testified, however, that the risk of the muscle transplant on the right extremity included loss of the leg because of the impaired blood supply. The bypass operation was discussed at trial in the context of the permanency of the pain and cramping upon walking. Dr. Nesemann stated that the cramping was "permanent unless a successful bypass becomes indicated, *and is successful*." [Emphasis sup-

plied.] Plaintiff has already undergone surgery to try to repair the nerve, such surgery being only partly successful. Thus, Misericordia, in arguing that plaintiff's physical incapacities could be fully repaired,[28] minimizes the damage and understates the drastic measures which are plaintiff's surgical alternatives.

Given the plethora of testimony concerning the extent of the injuries, the pain suffered by plaintiff, the corrective surgery undergone, the alternatives faced by plaintiff with or without further surgery, and the permanency of the residual disabilities, we affirm the verdict.

Misericordia also challenges the jury award for past and future wage loss. Generally, the measure of damages for loss of earnings is the difference, attributable to the injury, between the potential income before the injury and earning capacity afterward. A jury may also award damages for the period in which an injured person is unable to perform his usual work as a result of sustaining the injury. *Fischer et ux. v. Cleveland Punch & Shear Works Company, et al.*, 91 Wis.2d 85, 99, 280 N.W.2d 280, 287 (1979). In *Reinke, et ux. v. Woltjen*, 32 Wis.2d 653, 660, 146 N.W.2d 493, 497 (1966), the Wisconsin Supreme Court noted that in determining damages for impairment of earning capacity, "in most instances, the finder of fact must deal in some probabilities."

Many elements that go to a determination of impairment capacity cannot be proven with certainty. Proof of these elements must be permitted by facts or inferences that lead to reasonable probabilities. Some (but not all) of

---

[28] Misericordia states in its brief:

The only damages attributable to the 1975 operation at Misericordia Community Hospital are the nerve damage and the circulation damage, both of which can be repaired, although admittedly, there may be some risk involved.

the elements which cannot always be shown with certainty are the length of time a disability will exist, the degree of improvement or additional disability that will ensue, the aptitude and ability of a disabled person to engage in other types of work, and the compensation he will be able to obtain. As to these and other uncertain elements the trier of fact must be allowed to consider the reasonably apparent probabilities as they appear from the evidence, together with such known facts as his age, his education and training, the type work he was doing before the injury, and the compensation he was receiving, and then in its judgment determine what amount fairly and reasonably represents his loss of earning capacity, reduced to its present value.

In the case before us, the jury's task was made more difficult because plaintiff was only seventeen years old at the time of the surgery. He had worked parttime as a busboy while in school and had done some manual labor. Plaintiff did enlist in the army in January, 1976 after the surgery at Misericordia, but was given a medical discharge when physicians discovered he was incapable of going through basic training. He has only an eleventh-grade education and no skills. Complicating the plaintiff's bleak job picture is the fact that he must concentrate on the manner in which he must walk and cannot carry objects. Plaintiff started vocational training at a Goodwill Rehabilitation center before the surgery at County General. He worked at carpentry and maintenance work under circumstances in which he could maintain his own pace. Plaintiff tried manual labor after the surgery but discovered that he does not have the stamina for such work. He has made some progress in finishing his high school degree, but remained unemployed at the time of trial.

The jury utilized income records of the United States Department of Commerce to reach its determination. Such records showed that a person of plaintiff's age, race and education with a fulltime job had potential

earnings of $6,126 per year.[29] Plaintiff's work-life expectancy was $41\frac{5}{10}$ years. The jury awarded plaintiff $90,000 or 35.4% of what plaintiff would have earned according to these figures. Obviously, the jury did not feel that plaintiff's earning capacity was totally impaired but that his occupational opportunities were severely restricted.

Misericordia also objects to the jury verdict because plaintiff did not have any evidence of prior earnings or regular employment on which to base its decision. Evidence of prior earnings or employment is not necessary to sustain an award for loss of earning capacity for a minor. *Allen, et al. v. Bonnar, et al.*, 22 Wis.2d 221, 224–5, 125 N.W.2d 570, 572 (1963).[30] In *Allen,* the Wisconsin Supreme Court adopted the reasoning of the Minnesota court in *Capriotti v. Beck,* 117 N.W.2d 563, 568 (Minn. 1962) :

[29] Misericordia objects to the use of the tables from the United States Department of Commerce. They were properly admitted under *Donlea v. Carpenter, et al.,* 21 Wis.2d 390, 400–1, 124 N.W. 2d 305, 312 (1963): "We see, however, no reason why a court should not take judicial notice of figures based on expectancies computed on the basis of current statistics and published by responsible government agencies and include such expectancies in instructions to the jury in a personal-injury action." *Accord, Tills, et ux. v. Elmbrook Memorial Hospital, Inc.,* 48 Wis.2d 665, 180 N.W.2d 699 (1970).

[30] *Accord, Schulz, et al. v. St. Mary's Hospital,* 81 Wis.2d 638, 260 N.W.2d 783 (1978); *Thoreson v. Milwaukee & Suburban Transport Corporation,* 56 Wis.2d 231, 201 N.W.2d 745 (1972); *Peil v. Kohnke,* 50 Wis.2d 168, 184 N.W.2d 433 (1971). *See also, Wilson v. Sorge,* 256 Minn. 125, 97 N.W.2d 477 (1959) where the court held that it was within the province of the jury to consider such factors as a minor's age, life expectancy, health, habits, occupation, talents, skills, experiences, training and industry in an action to recover for loss of future earning capacity without recourse to past earnings.

"The evidence was clearly sufficient to warrant a finding that Todd's future earning capacity will be impaired. Even though the extent of that impairment is extremely difficult to evaluate in the case of this young child who is far removed by years from even demonstrating an earning capacity, we can find no basis in principle or reason to hold that the rule should be limited in its application because of the age of the injured party where there is sufficient evidence of permanent disability. Its application must be left to the jury, subject to the admonition as here given by the court to refrain from making a determination based upon speculation, conjecture, passion, or prejudice, and subject further to the post-verdict scrutiny of the trial judge." [Footnote omitted.]

In light of the uncertain elements of the plaintiff's future, the probability of vocational retraining and the other probabilities which the jury had to weigh, we do not find the $90,000 award excessive, and affirm.

*By the Court.*—Judgment affirmed.