James W. BRANCH, Jr., Plaintiff,

v.

HEMPSTEAD COUNTY MEMORIAL
HOSPITAL, et al., Defendants.

Civ. No. 80–4073.

United States District Court,
W. D. Arkansas,
Texarkana Division.

April 23, 1982.

G. William Lavender, Arnold, Lavender, Rochelle, Barnette & Franks, Texarkana, Ark., for plaintiff.

Michael Stevens, Atchley, Russell, Waldrop & Hlavinka, Texarkana, Tex., for defendants.

## MEMORANDUM OPINION

H. FRANKLIN WATERS, Chief Judge.

This is a case in which the plaintiff, Dr. James W. Branch, Jr., an osteopathic physician on the staff of Hempstead County Memorial Hospital, a county hospital, filed suit against the hospital, its administrator, and the members of the Board of Governors, alleging that his constitutional rights had been violated by the action of the Board of Governors in restricting his privilege to perform surgery in the hospital. A complaint was originally filed on October 14, 1980, alleging a cause of action under 42 U.S.C. § 1983, 28 U.S.C. §§ 2201 and 2202, and 42 U.S.C. § 1988. It was alleged that this Court has jurisdiction under the provisions of 28 U.S.C. § 1343(3), (4). In addition to the initial complaint, and contemporaneously with the filing of it, the plaintiff filed a motion for a temporary restraining order and a preliminary injunction. The contents of the complaint, as amended by an amended complaint filed February 1, 1982, will be discussed in more detail below.

In short, the complaint alleges that the hospital, acting through its Board of Governors, on July 10, 1980, summarily denied plaintiff the privilege to perform surgical operations in the hospital without providing him with due process of law, in violation of his rights guaranteed by the United States Constitution and the by-laws of the hospital.

In due time, the defendants answered the complaint and filed a response to the motion for temporary restraining order and preliminary injunction, objecting thereto.

The matter was referred to Magistrate Ned A. Stewart, Jr., with directions that he schedule and hold a hearing relative to the claim for a temporary restraining order and preliminary injunction. The hearing was scheduled by Magistrate Stewart on November 12, 1980, but before the hearing commenced, the plaintiff agreed to drop the request for a temporary restraining order and preliminary injunction in exchange for defendant's agreement to provide to the plaintiff a due process hearing. The parties were to submit to the Court an agreed consent order. The consent order was presented to United States District Judge George Howard, Jr., on December 18, 1980, signed and approved by the attorney for the defendants and by plaintiff, Dr. Branch, individually. The consent order provided, among other things, that a hearing would be held by a hearing committee composed of Drs. George Garrett and J. E. Little, and Board Members Joe Short, Harold Hendrix and Tommy Love. The consent order provided the time table that was to be followed and provided that on or before December 1, 1980, plaintiff "will be supplied with formal written notice of all charges against him, including identification of all cases of treatment to be relied upon." It was provided that the hearing committee would convene on December 15, 1980, and continue until completed and that the committee would return its decision on or before January 2, 1981. The order provided that "the burden of proof before the hearing committee shall be by preponderance of the evidence." It further provided that "questions of procedure and evidence shall be controlled by the rules and statutes governing administrative proceedings under the Arkansas Administrative Procedures Act."

The hearing was held as scheduled, and on December 31, 1980, each member of the hearing committee executed a document entitled "Findings of Fact and Conclusions of Law." This document was filed with the Court on January 13, 1981. The findings of fact contained in the document are in considerable detail, consisting of 22 separate findings, with these separate findings, in total, containing 29 separate subparts.

In addition, the document signed and filed by the hearing committee established by the consent order set forth the following conclusions of law made by the committee, to-wit:

## CONCLUSIONS OF LAW

1. That the aforesaid findings of fact made by this Committee were proven by a preponderance of the evidence.

2. That James W. Branch, Jr., D.O., may treat trauma in the emergency room of Hempstead County Memorial Hospital and may perform minor procedures in the emergency room of Hempstead County Memorial Hospital.

3. That James W. Branch, Jr., D.O., can not perform any of the following types of surgery at Hempstead County Memorial Hospital as chief operating surgeon: (a) vascular surgery; (b) thoracic surgery; (c) neuro surgery; (d) intra-abdominal surgery; (e) orthopedic surgery; or, (f) urological surgery. That James W. Branch, Jr., D.O.'s surgical privileges to perform the above types of surgery as chief operating surgeon at Hempstead County Memorial Hospital should be and the same are suspended.

4. That James W. Branch, Jr., D.O. may assist in surgical procedures, at Hempstead County Memorial Hospital, only a board certified or board eligible surgeon on the staff of Hempstead County Memorial Hospital, which said board certified surgeon or board eligible surgeon can not be in association or practice with Dr. James W. Branch, Jr., D.O.

Although both the consent order and the medical staff by-laws attached to the complaint filed by the plaintiff and introduced as evidence at the trial provide that a doctor may appeal an adverse decision by the hearing committee to the full Board of Governors within 15 days of the decision, there is no indication in the record that the appeal to the Board of Governors was made.

The matter was tried to the Court without a jury on February 1 and 2, 1982, and at the conclusion of the trial, the Court, at the request of counsel, established a briefing schedule and took the matter under advisement. The briefs of counsel for the parties have been filed and considered by the Court, and after consideration of the evidence, the Court now makes and files its findings of fact and conclusions of law, separately stated.

### FINDINGS OF FACT

From the evidence adduced at the trial in this matter, the Court makes the following findings of fact:

1. That James W. Branch, Jr., D.O., is an individual residing at Hope, Hempstead County, Arkansas, and is licensed to practice medicine in the State of Arkansas.

2. That Hempstead County Memorial Hospital is a county hospital organized under and operating pursuant to the laws of the State of Arkansas at Hope, Hempstead County, Arkansas.

3. That defendant, Billy Richburg, was at all times pertinent the Administrator and Chief Executive Officer of the hospital and acting in his official capacity as such.

4. That the defendants, Joe Short, Travis Mitchell, Harold Hendrix, Paul Choate, LaGrone Williams, Roxie Lawrence and Tommy Love, were at all times pertinent hereto duly appointed and acting members of the Board of Governors of the hospital and were, at times relevant hereto, operating and acting in their official capacities.

5. That the defendant, C. Lynn Harris, M.D., was at all times pertinent hereto acting in his capacity as Chairman of the Credentials Committee of the hospital's medical staff.

6. That on or before July 10, 1980, plaintiff was a member of the hospital's medical staff, classified as being in an active status and authorized to conduct general surgery in the hospital.

7. That on or about May 12, 1980, Administrator Richburg received a telephone call from Dr. Donald Duncan, a surgeon with a specialty of gastrointestinal endoscopy, of Texarkana, Arkansas, complaining of a surgical procedure used by plaintiff on a patient that was subsequently referred to Dr. Duncan. This particular patient later died, with at least one of the causes being complications from the surgery performed by plaintiff.

8. That Administrator Richburg brought this complaint to the attention of Board Member Joe Short, an attorney, who, shortly thereafter, in a telephone conversation, discussed the complaint with Dr. David Stephens, Chief of the hospital's medical staff.

9. That on May 27, 1980, at the request of the Credentials Committee of the hospital staff, Dr. Duncan wrote a letter (Plaintiff's Exhibit 2) which, in pertinent part, provided as follows:

On May 8, 1980, Mr. Curtis Dorman was referred from Hempstead County Hospital to me by Dr. Jimmy Branch. Dr. Branch had operated on him approximately one week prior to his transfer here. It was necessary to re-explore him on May 9, 1980, on which occasion I found the following:

(a) Perforation of the cecum with fecal contamination of the abdominal cavity;

(b) Retrocolic loop choledochojejunostomy with a row of staples across the afferent loop spanning the distance across approximately three-fourths of the bowel;

(c) Peritonitis secondary to leakage of bowel contents around a T-tube that had been placed in the efferent loop.

(d) Severe pancreatitis.

In my opinion the technique that had been followed was neither one that is recognized generally nor one that was

appropriate in this case. Based on my findings at the time of this surgery I advised Dr. Branch of my opinion that he should not operate.

After receipt of the letter, the hospital administration took no immediate action because the Credentials Committee of the medical staff had a regularly scheduled meeting on June 12, 1980, but no substantive action was taken by the Credentials Committee, with at least one of the doctors on the committee indicating that he didn't think that the committee ought to get involved at this point. In discussion, it was decided that Dr. Lowell Harris would investigate the matter and talk to Dr. Branch and he did so on June 20, 1980, apparently with little result. The hospital administration still took no action because the medical staff was scheduled to meet on July 8, 1980, at a regular meeting, and although Dr. Duncan's letter was attached to the report of the Credentials Committee received by the medical staff at the meeting, the staff did not discuss the matter, and a motion was made by Dr. Branch, and seconded by Dr. Little, an osteopath and one of Dr. Branch's best friends, that all members of the medical staff be reappointed for a term of two years, with the same privileges.

10. That after learning of the action or inaction of the medical staff, Administrator Richburg, believing that the decision to reappoint Dr. Branch was hastily made and without consideration of the Duncan letter, and having concern that the reappointment had been moved by Dr. Branch and seconded by his friend, Dr. Little, decided that this matter should be called to the attention of the Board of Governors.

11. That Travis Mitchell, a pharmacist who was secretary of the Board of Governors at the time, called a special meeting of the Board of Governors on July 10, 1980, because he was concerned about the charges contained in Dr. Duncan's letter and the conversation and allegations that he had heard from other doctors and "on the street" which caused him some concern about Dr. Branch's competency to perform the types of operations which resulted in the Duncan letter. This caused him to have concern about the 25,000 people in the county and whether they were getting the type and quality of medical care that he thought they were entitled to.

12. That at the special called meeting held at Board Member LaGrone Williams' hardware store, the Board of Governors of the hospital voted to change plaintiff's staff privileges from "active" to "courtesy" and to suspend his authorization to conduct surgery. Plaintiff was not notified of the meeting and did not attend.

13. That by letter dated July 11, 1980, signed by Administrator Richburg (Plaintiff's Exhibit 4), plaintiff was informed that "effective immediately, your staff membership is temporarily changed from ACTIVE to COURTESY and your surgical privileges are rescinded." The letter called attention to the provisions of the medical staff bylaws relative to appeal.

14. That by letter dated July 18, 1980, Dr. Branch demanded a hearing and requested that the hearing be scheduled on a date after July 27, 1980, "due to a previous commitment by witness for my behalf." (Plaintiff's Exhibit 5)

15. That by letter dated July 24, 1980, Dr. Branch was notified that a hearing committee had been appointed by the Board of Governors and that a hearing would be held on July 29, 1980. The letter advised that the meeting would be organizational only and that no testimony would be taken at that time.

16. That the meeting of the hearing committee was held as scheduled, and was attended by Dr. Branch, without the benefit of counsel, although he admits that he had a right to counsel and knew that he did and could afford one.

17. That at such meeting it was decided that charts of operations on patients performed by Dr. Branch would be sent to the Arkansas Foundation for Medical Care which is the Professional Standards Review Organization (PSRO) for the State of Arkansas with responsibility to review all federally funded patients, to assure that the

care that they receive meets professionally recognized standards. This organization is mandated by federal law for federally funded patients and hospitals.

Dr. Branch participated in the decision to refer the charts to the PSRO and agreed that no further hearings would be held until a report was received from such organization.

18. That shortly subsequent to the July 29, 1980, meeting the PSRO representatives came to the hospital and chose certain charts to study, but, for some reason not explained by the evidence, the organization did not choose the chart of the patient which resulted in the Duncan letter.

19. That between the date of July 29, 1980, and October 14, 1980, the date that this lawsuit was filed, all parties waited on a report from PSRO as had been agreed to at the organizational meeting. During this period, various Board members, from time to time, inquired of the Administrator as to the action taken by PSRO, and were advised that no report had been received from the organization.

20. That during such period, Dr. Branch did not indicate to anyone that he was dissatisfied with the wait, nor did he request a hearing or request any modification or variation in the procedure which had been agreed to at the organizational meeting.

21. That the first notice that the hospital administrator or its Board of Governors had that Dr. Branch was not satisfied with the procedure which was agreed to was when a summons and a copy of the complaint filed in this matter was served on each of the defendants on and shortly after October 15, 1980.

22. That a hearing was scheduled in this lawsuit on plaintiff's motion for a temporary restraining order and preliminary injunction, but when the parties appeared at the hearing, and before such hearing commenced, it was agreed that a consent order would be agreed to by the parties and presented to the Court for execution.

23. That the consent order was prepared by the parties as agreed and executed on December 11, 1980, by Dr. Branch, individually. Such consent order, described in more detail above, among other things, appointed a hearing committee consisting of George Garrett, M.D., J. E. Little, D.O., Joe Short, Board Member, Harold Hendrix, Board Member, and Tommy Love, Board Member. Dr. Branch had input into the makeup of the committee and, in fact, objected to some of the proposed members and required that changes in the membership of the hearing committee be made before the consent order was executed by him. He agreed to the final make-up of the committee.

24. That as required by the consent order and in complete compliance with the consent order, Dr. Branch was notified by letter dated November 28, 1980, signed by Administrator Richburg (Plaintiff's Exhibit 8) of the charges against him. As required in the consent order, the letter not only provided plaintiff with formal written notice of the charges against him, it included "identification of all cases of treatment to be relied upon." Such identification was made by listing specific chart numbers on which the hospital would rely.

25. That, upon request by Dr. Branch, the hospital, through its attorney, by letter dated December 10, 1980, and received by Dr. Branch on December 11, 1980, specified as to each chart listed in the November 28, 1980, letter the specific deficiencies which the hospital believed existed in the treatment of the patients represented by each such chart.

26. That the hearing required by the consent order was conducted on December 15, 16 and 17, 1980. Dr. Branch, having discharged his attorney on November 25, 1980, represented himself at the hearing. Dr. Branch admitted at the trial that he knew that he had a right to an attorney and that he could have afforded one (his income at the time was considerably in excess of $100,000.00 per year).

27. That Dr. Branch testified at the trial that he had no complaint to make about the manner in which the hearing was carried

out other than that he did not understand the "legal maneuvering" that went on during the hearing.

28. That after hearing all the evidence, the hearing committee deliberated, considering the proposed findings of fact and proposed conclusions of law one by one, discussing each in detail and reducing same to writing only when all members of the hearing committee agreed. All members of the hearing committee, including the two doctors (one of which was a fellow osteopath and good friend of Dr. Branch) signed the findings of fact and conclusions of law, agreeing that they correctly set forth the decision reached by the hearing committee.

29. That on December 31, 1980, Administrator Richburg delivered to Dr. Branch the hearing committee's findings of fact and conclusions of law.

30. That on January 21, 1981, PSRO sent a letter to Dr. Branch and the hospital containing certain preliminary findings made by the organization and requesting comments by Dr. Branch. (Plaintiff's Exhibit 10)

31. That by letter dated February 24, 1981, Dr. Branch responded to the preliminary findings of PSRO. (Plaintiff's Exhibit 11)

## DISCUSSION

■ The law is well settled that a physician on the staff of a public hospital may not be dismissed or his privileges reduced without compliance with certain procedural and substantive due process requirements, and the defendants do not contend otherwise. On page 3 of their brief filed herein, they state:

Defendants readily admit that physicians on staffs of public hospitals are afforded certain substantive and procedural due process protections as guaranteed by the Fourteenth Amendment. *Klinge v. Lutheran Charities Association of St. Louis*, 443 F.2d 234, 238 (10th Cir. 1971). *Poe v. Charlotte Memorial Hospital, Inc.*, 374

F.Supp. [1302] 1304, 1312 (W.D.N.C.1974). (Defendants have incorrectly cited *Klinge v. Lutheran Charities Association of St. Louis*. The correct cite is 523 F.2d 56 (8th Cir. 1975).)

Thus, the issues which this Court must determine are not whether Dr. Branch was entitled to substantive and procedural due process, but whether the procedure used to reduce his privileges afforded him the protections guaranteed by the Constitution, and, if not, what remedies he is entitled to.

■ Before considering whether the hearing afforded Dr. Branch provided the required substantive and procedural due process protections, the Court will first consider whether the hearing that was provided was timely.[1] The testimony in this respect adduced at the trial is somewhat in conflict, but the Court believes that the credible evidence indicates that the hospital recognized, all along, its duty to provide Dr. Branch with a timely hearing, and that the procedure that it followed was one agreed to by Dr. Branch or at least willingly acquiesced in by him. It should be noted that the organizational meeting held on July 29, 1980, by the hearing committee first appointed was apparently delayed to that date because of the request of Dr. Branch. In his letter dated July 18, 1980 (Plaintiff's Exhibit 5), he requested that the hearing not be held before July 27, 1980, because of a previous commitment by a witness in his behalf.

While there is a conflict between the testimony of Dr. Branch and Board Member Joe Short and Administrator Richburg as to what transpired at such meeting, the conflict is not, when properly considered, material. Mr. Short and Mr. Richburg contended, without equivocation, that the agreement reached at the organizational meeting was that the charts in question would be referred to the Professional Standards Review Organization for the State of Arkansas, and that its findings would be determinative of the issues raised. Dr. Branch contends that he understood that the hear-

1. Plaintiff concedes that, under proper circumstances, a doctor's privileges may be summarily suspended pending a timely hearing. See Plaintiff's brief at p. 10.

ing was to take place in three phases. The first phase was to be a consideration by the committee of the findings of Dr. Duncan and any other evidence that the hospital or the medical staff desired to introduce; that in the second phase, he would be afforded an opportunity to present any witnesses in his behalf; and that the third phase was to be receipt of the recommendations or findings of the PSRO. However, Dr. Branch unequivocally admitted in answers to questions from the Court that, regardless of his understanding, he knew that the matter would not be concluded and a final determination made until the report was received from PSRO. It is obvious from the record that, through no fault of anyone at the hospital or of Dr. Branch, PSRO did not report as quickly as everyone contemplated that they would, but this is certainly not the fault of the defendants.

■ The evidence is also uncontroverted, and Dr. Branch admitted, that between July 29, 1980, and the date that he filed this action, October 14, 1980, he did not advise the defendants that he was unhappy with the delay or request or demand that a hearing be held. He attempts to excuse that by saying that he misread the medical staff by-laws and believed that the hospital had 60 days to provide him with a hearing, but, again, that is not the fault of the defendants. It is true that he was not represented by counsel in this matter during a good portion of the proceeding, but again, whose fault is that? He readily admitted that he knew that he could have a lawyer and that he could afford one, since, according to his testimony, he had income at the time of well in excess of $100,000.00 per year. The Court does not believe that the fact that he chose, of his own volition, not to be represented by counsel lends any support to his argument that the Court should find that the hospital did not give him a timely hearing even though he did not complain, simply because he didn't understand the law or the medical staff by-laws. In short, the Court finds that Dr. Branch agreed that his case would not be terminated and a decision made, regardless of the exact order in which this was to be done, until the report

was received from PSRO. It really makes no difference whether he thought that other procedures were to intervene, he admittedly knew that he would not have a final determination of the matter until the report was received.

Thus, the Court finds that the reason that Dr. Branch was not afforded a hearing until December 15, 1980, was because the defendants were following the procedure either specifically agreed to by Dr. Branch or at least willingly acquiesced in by him. In his reply brief filed in this matter (p. 6) the plaintiff asks: ". . . if the defendants rely so heavily on an 'agreement' to abide by PSRO's review, then why didn't they abide by the decision that PSRO finally made, . . ." The answer to this question is that the plaintiff would not let them. Until the lawsuit was filed on October 14, 1980, the matter was proceeding just as the parties agreed, when, without warning, plaintiff sued the defendants and served papers on them, indicating for the first time since the organizational meeting on July 29, 1980, that he was not happy with the procedure being followed. He cannot now complain that the procedure agreed to was not followed since it was through his actions that the entire procedure was derailed from the method that was agreed upon.

■ For these reasons, the Court finds that the plaintiff cannot now complain that he was not afforded a due process hearing until December 15, 1980, and that the failure by the defendants to provide a hearing before that time did not deprive him of due process guarantees and affords no basis for damages against the defendants.

Since the Court has found that the delay in providing the December 15, 1980, hearing does not give the plaintiff a cause of action for damages, it must now determine whether the hearing held at that time and the notices and other procedures leading to it provided plaintiff with the protection guaranteed by the United States Constitution.

## PROCEDURAL DUE PROCESS

■ The United States Supreme Court has held that no particular form of proce-

dure is required, but that certain elements must be present. *Mitchell v. W. T. Grant Co.*, 416 U.S. 600, 94 S.Ct. 1895, 40 L.Ed.2d 406 (1974). These include, at least (1) adequate notice, *Goss v. Lopez*, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975); (2) adequate opportunity for a hearing, *Armstrong v. Manzo*, 380 U.S. 545, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965); (3) the right to introduce evidence, *Baltimore & Ohio Railroad Co. v. United States*, 298 U.S. 349, 56 S.Ct. 797, 80 L.Ed. 1209 (1936); and (4) the right to confront and cross-examine witnesses, *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974).

■ The Court has carefully considered the procedure employed by the defendants which led up to the December 15, 1980, hearing, and finds that the procedure employed not only complies with the explicit provisions of the consent order entered into between the parties and approved by the Court, but also complied with the requirements of law in this respect. It should be noted that in the consent order the parties agreed that: "On or before December 1, 1980, plaintiff will be supplied with formal written notice of all charges against him, including identification of all cases of treatment to be relied upon." Since the consent order is what the defendants and plaintiff were directed by the Court, after agreement of the parties, to do, it is probably sufficient to say that the letter of November 28, 1980 (Plaintiff's Exhibit 8), complies completely with that requirement. The order required that notice be given before December 1 and that, among other things, the cases relied on be identified. The November 28 letter does exactly that and even specifies the chart numbers of patient charts to be relied upon. However, because Dr. Branch requested additional information, on December 11, 1980, four days before the scheduled hearing, the defendants hand delivered to Dr. Branch a letter which set forth in complete detail the charges made against him. For this reason, the Court believes that it is specious for the plaintiff to now argue, as he does, that he did not have sufficient notice of the charges made to properly defend himself. He had

what the Court believes to be sufficient notice in sufficient detail as early as December 1, 1980, or before, and notice with more than sufficient detail as early as December 11, 1980. The Court finds that the notice requirements of procedural due process were met.

As to the second, third and fourth requirements of a procedural due process hearing, the Court has carefully considered the transcript of the testimony taken at the hearings on December 15, 16 and 17, 1980, and finds that the plaintiff was afforded an adversary type, almost judicial type, hearing and had the right to confront and cross-examine witnesses and to put any evidence in the record that he desired. He not only had that right, he did so, and subpoena power was provided to him. In fact, at the trial of this matter, in answer to a question by the Court, the plaintiff unequivocally stated that he didn't really complain about anything that took place at the hearing other than that he didn't understand the "legal maneuvering." As has already been pointed out, the plaintiff chose not to hire an attorney and apparently felt at the time that he could adequately provide a defense for himself. After reading the transcript, the Court believes that Dr. Branch, representing himself, did a creditable job in introducing the evidence that he had and in cross-examining witnesses presented by the hospital and that he cannot now complain that he didn't understand it all.

## SUBSTANTIVE DUE PROCESS

■ Plaintiff argues that the hearing committee which heard his case was not composed of totally unbiased individuals and that for that reason he was not provided with substantive due process. The simple answer to that argument is that the defendants were ordered by an order entered on the 18th day of December, 1980, and signed by George Howard, Jr., United States District Judge, to provide a hearing by the exact committee that heard Dr. Branch's case. Even if the defendants had wanted the committee to be composed of

other individuals, it could not have done so. The simple fact is that the court order was entered only after Dr. Branch agreed to the composition of the hearing committee, and after he had required certain changes to be made. It contained, at his insistence, Dr. J. E. Little who testified for him at the trial and who, Dr. Branch admitted, was one of his best friends. It was obvious from Dr. Little's testimony that he not only was a friend of Dr. Branch, but that he tried to help him in every way he could during his testimony. It is significant to note, however, that in spite of this Dr. Little agreed to the findings of fact and conclusions of law that were finally submitted by the hearing committee, and signed the document. The plaintiff cannot now complain that the hearing committee which he agreed to should have been composed of persons other than those he agreed to.

▆ Plaintiff contends that he was denied substantive due process because the hospital arbitrarily took the charges made by Dr. Duncan out of the hands of the hospital's professional medical staff. The evidence indicates that the fact was that the hospital followed the channels provided for by the medical staff by-laws, but that the Credentials Committee took no action because at least one of the members didn't want to get involved, and the medical staff at its meeting took no action because a resolution was passed, made by Dr. Branch and seconded by Dr. Little, that all medical staff members be reappointed with the same privileges. This was done in spite of the fact that Dr. Duncan's letter was provided to the participants of the meeting and in spite of the fact that, according to the testimony, the letter and the charges contained therein were not even discussed. As Board Member Joe Short testified, the Board then decided that the medical staff was not going to take any action on the charges and that for this reason the Board was required to. The Court believes that that decision by the Board was well justified under the circumstances. Of course, the law clearly is that the governing body of a hospital cannot wholly delegate to the staff its duty to see that only qualified

physicians practice in a hospital, and it has an independent duty to review and examine the recommendations of any medical staff committee to which the authority to examine physicians and make recommendations is delegated. The governing body has a duty to establish procedures that will insure that only qualified doctors provide services to the patients of the hospital in a non-negligent manner, and cannot look the other way simply because some medical staff committee has decided that a particular doctor can have privileges or continue to have privileges which he desired, even though not qualified. If the individual members of the governing board do not meet this duty, they are individually liable for damages. *Darling v. Charleston Community Hospital*, 33 Ill.2d 326, 211 N.E.2d 253 (1965), *cert. denied*, 383 U.S. 946, 86 S.Ct. 1204, 16 L.Ed.2d 209 (1966); and *Johnson v. Misericordia Community Hospital*, 97 Wis.2d 521, 294 N.W.2d 501.

▆ Thus, the Board of Governors of Hempstead County Memorial Hospital not only had a right but an obligation and duty to take action where the medical staff did not do so, and they carried out that duty, and plaintiff was not deprived of due process because they did.

▆ Plaintiff next complains that there was not sufficient evidence adduced at the hearing which was provided to warrant the action taken by the hospital. After reading the transcript of the hearing, the Court disagrees.

▆ The Court's function in reviewing a hospital's denial of privileges is well set out in *Laje v. R. E. Thomason General Hospital*, 564 F.2d 1159 (5th Cir. 1977), as follows:

The correct approach to the judicial review of the hospital's denial of staff privileges is set out in *Woodbury v. McKinnon, supra,* and *Sosa v. Board of Managers of Val Verde Memorial Hospital*, 437 F.2d 173 (5th Cir. 1971). Those cases make clear that the decision of a hospital's governing body concerning the granting of hospital privileges is to be

accorded great deference. This is so because of the court's obvious lack of medical expertise. Judicial intervention must be limited to an assessment of those factors which are within the court's expertise to review. For this reason, our cases have gone no further than to require that the procedures employed by the hospital are fair, that the standards set by the hospital are reasonable, and that they have been applied without arbitrariness and capriciousness. *Woodbury v. McKinnon*, 447 F.2d at 845. As we stated in *Woodbury*, "[t]he decision resulting from the hearing must be untainted by irrelevant considerations and supported by sufficient evidence to free it from arbitrariness, capriciousness or unreasonableness." *Id.* at 842.

In *Klinge v. Lutheran Charities Association of St. Louis*, 523 F.2d 56 (8th Cir. 1975), the United States Court of Appeals for the Eighth Circuit quoted with approval from the Fifth Circuit case of *Sosa v. Board of Managers of Val Verde Memorial Hospital*, 437 F.2d 173 (5th Cir. 1971):

No court should substitute its evaluation of such matters for that of the Hospital Board. It is the Board, not the court, which is charged with the responsibility of providing a competent staff of doctors. The Board has chosen to rely on the advice of its Medical Staff, and the court cannot surrogate for the Staff in executing this responsibility. Human lives are at stake, and the governing board must be given discretion in its selection so that it can have confidence in the competence and moral commitment of its staff. The evaluation of professional proficiency of doctors is best left to the specialized expertise of their peers, subject only to limited judicial surveillance. The court is charged with the narrow responsibility of assuring that the qualifications imposed by the Board are reasonably related to the operation of the hospital and fairly administered. In short, so long as staff selections are administered with fairness, geared by a rationale compatible with hospital responsibility, and unencumbered with irrelevant considerations, a court

should not interfere. Courts must not attempt to take on the escutcheon of Caduceus. *Id.* at 177.

Thus, the role of the court in reviewing the actions of hospitals in denying privileges or reducing privileges is severely limited and, as the Court pointed out in *Kaplan v. Carney*, 404 F.Supp. 161 (1975):

If the judgment is supported by substantial evidence and was made using proper criteria, after a satisfactory hearing, on a rational basis, and without irrelevant discriminatory and arbitrary influences, the work of the court comes to an end. *Woodbury v. McKinnon*, 447 F.2d 839 (5th Cir. 1971).

Plaintiff argues that the consent order entered in this matter directs that the Court determine whether the action of the hearing committee was supported by a preponderance of the evidence. The Court does not believe that that is at all what the consent order says, and we doubt that the Court could have so decided had it desired to. In any event, what the order says is that: "The burden of proof before the hearing committee shall be by preponderance of the evidence." The Court believes that all that that provision says is that the hearing committee will decide the case based on a preponderance of the evidence, and there was certainly no attempt to bind this court to disregard what is clearly the law as set forth above.

As was indicated by the case law cited above, there is good reason for limiting the function of a court, and this Court does not intend, in this case, or any other case, to become a super hospital governing board, and substitute its judgment for the judgment of that board. It intends to follow the case law set forth above and to accord great deference to the finding of the hearing committee appointed by the governing board of Hempstead County Memorial Hospital, and not to reverse or in any way interfere with the decision of that body unless it is determined that the action taken was arbitrary and capricious. To do otherwise would have a chilling effect on the

attempts of hospitals to rid their staffs of doctors who do not meet competency standards expected by the hospital and the community.

After a complete review of the testimony and evidence from that hearing, the Court finds that the action of the board was supported by the evidence and was not arbitrary and capricious. While it is true that some of the evidence was controverted, it is not this Court's function to determine which of the witnesses to believe or disbelieve. Suffice it to say that the Court finds that if the hearing committee chose to believe, as it apparently did, the testimony which was introduced to show that Dr. Branch was not competent to perform surgery in the hospital, it was its function to do so and a function that this Court cannot and will not attempt to usurp.

If the following testimony which was introduced at the hearing was believed, the decision of the hearing committee was not, by any stretch of the imagination, arbitrary and capricious. On direct examination at the instance of the hospital, Dr. Lowell Harris testified that Dr. Branch had demonstrated lack of competence, skill and knowledge ordinarily possessed by members of the medical profession in the locality. In support of his conclusion, Dr. Harris testified in detail that Dr. Branch had improperly attempted to graft skin over a cancerous area in case number 53926, and that such was clearly an improper operative procedure (p. 36). Dr. Harris further referred to case number 55307, testifying that Dr. Branch's use of Kirschner wire to treat a fractured toe was an unacceptable surgical procedure, which, in his opinion, led to a gangrenous condition necessitating amputation, which could have been avoided (p. 40).

In case number 54776, Dr. Harris testified that Dr. Branch had amputated a patient's leg below the knee without adequate or sufficient indications that such was essential (p. 44). In case number 55320, Dr. Harris offered his opinion that Dr. Branch had prescribed a drug for a post-partum female patient which was contraindicated, and that Dr. Branch had rendered insufficient and improper post-operative care (p. 46).

Dr. Harris testified that Dr. Branch had surgically removed a normal, healthy appendix wherein it had previously been determined that surgery was not indicated in case number 54570 (p. 54).

In case number 54794 under review, Dr. Harris testified that Dr. Branch had not sufficiently obtained medical control of a serious diabetic condition prior to performing surgery (p. 59), and that in another case, number 54800, Dr. Branch had performed major surgery when, in his opinion, the patient was not medically fit for the procedure (p. 67).

In Dr. Harris' opinion, each of these flaws in procedure and judgment represent a lack of competence and skill ordinarily possessed by surgeons in the community in good standing.

The hospital then called Dr. Donald Duncan to testify. Dr. Duncan testified with reference to case number 54854 that he had been called upon to treat a former patient of Dr. Branch, and had discovered, upon exploration, that Dr. Branch's poor surgical judgment and inadequate knowledge of procedure had caused green feces to leak between clips placed by Dr. Branch. Dr. Branch's inserting of a "T-tube" in this case was, in his opinion, unnecessary, improper and fatal (p. 167).

Dr. David Stevens later testified that in case number 55131, Dr. Branch's amputation of the patient's leg was not medically justified (p. 290). In case number 53926, referred to above, Dr. Stevens corroborated Dr. Harris' testimony that Dr. Branch had failed to use normal diagnostic skill in treating the skin-graft patient. In the toe case, number 55307 above, Dr. Stevens concluded, as did Dr. Harris, that the procedure employed by Dr. Branch was medically unnecessary (p. 300).

Ken Kratz testified that he had participated in Dr. Branch's operation in case number 54800, and offered his opinion that Dr. Branch had utilized an improper surgical procedure and had used extremely poor

judgment in his choice of anesthetic in case number 54766, and that such constitutes poor medical care (p. 327).

Dr. John Hernsberger testified that Dr. Branch had performed surgery without sufficient indication of necessity for it in case number 54854, that Dr. Branch's use of the "T-tube" was not necessary (p. 355), and that on the whole, Dr. Branch had demonstrated a lack of skill and learning ordinarily possessed by surgeons in good standing (p. 357). In case number 53926, Dr. Hernsberger concluded that Dr. Branch used unacceptable surgical practices in the skin-graft treatment, and that in case number 54766, Dr. Branch was at fault in not referring the patient to a more adequately equipped hospital and that the patient was thereby deprived of adequate treatment (p. 361).

Mr. Jack Johnson, who had participated in Dr. Branch's surgery in case number 54800, testified that Dr. Branch had utilized an improper surgical procedure in the course of the operation.

Mr. Billy Richburg, on re-direct, pointed out that Dr. Branch had improperly performed an autopsy on the deceased patient in case number 54800, when pathologists were available for this task. Dr. Leland Dodd, pathologist, corroborated this, and further cited various discrepancies in Dr. Branch's hospital notes (p. 394).

Finally, Nelda Harmon testified that Dr. Branch had attempted to alter the patient's permanent medical record in case number 54854.

It is true that Dr. Branch was able to elicit some favorable testimony. It is important to note that most of this testimony came from lay witnesses who were either treated by Dr. Branch or members of their family were, and they, in general, testified that they were satisfied with his treatment. It is true that at least some of these witnesses were persons who had been the patients referred to by chart numbers in the case made against Dr. Branch, but the general gist of this testimony was that the patients were satisfied with the services performed by Dr. Branch. This may indicate nothing more than the fact that Dr. Branch has at least one attribute of a good doctor and that is that he has an excellent bedside manner, but the Court does not believe that that necessarily means that the hearing committee, which had the duty to believe or disbelieve the witnesses, was obligated to believe that Dr. Branch was a good and competent surgeon. There was certainly substantial evidence, if believed, to support its finding and the Court believes that the decision made was supported by evidence and that the action taken was not arbitrary and capricious.

It is apparent that, in accordance with the above, the Court does not believe that the plaintiff is entitled to any relief on the basis of the proof presented at the trial.

CONCLUSIONS OF LAW

Based upon the evidence and findings of fact set forth above, the Court makes the following conclusions of law:

1. That the Court has jurisdiction of the parties and the subject matter of plaintiff's claim under 28 U.S.C. § 1343(3), (4), and that for purposes of this action brought pursuant to 42 U.S.C. § 1983, the actions of the defendants should be considered as "state action."

2. That plaintiff has not met his burden of proving that the termination of his employment violated any right protected by the Constitution of the United States or any federal law or regulation.

3. That the decision of the hearing committee of the Board of Governors of Hempstead County Memorial Hospital was based upon sufficient evidence and was not arbitrary and capricious.

4. That judgment should be entered against the plaintiff and in favor of the defendants, with each of the parties to pay the costs incurred by them.

5. That plaintiff is not entitled to an award of attorney's fees to be paid by the defendants.

A judgment will be entered to carry out the conclusions reached.